```
1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF CONNECTICUT
2
  - - - - - - - - - - - - - - - - x
3                                   No. 3:20-CR-193 (MPS)
  UNITED STATES OF AMERICA
4                                   JANUARY 13, 2023
  vs.
5                                   9:23 A.M.
  KYLE FASOLD
6                                   SENTENCING
  - - - - - - - - - - - - - - - - x
7

8                      EXCERPTS OF SENTENCING

9                        450 Main Street
                        Hartford, Connecticut
10

11         BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

12


13

14  APPEARANCES:

15  FOR THE PLAINTIFF:

16          UNITED STATES ATTORNEY'S OFFICE
                450 Main Street, Room 328
17              Hartford, Connecticut 06103
            BY:  NANCY V. GIFFORD, AUSA
18          BY:  DANIEL CUMMINGS, AUSA

19  FOR THE DEFENDANT:

20          FEDERAL PUBLIC DEFENDER'S OFFICE
                10 Columbus Boulevard, 6th Floor
21              Hartford, Connecticut 06106
            BY:  CHARLES F. WILLSON, AFD

22

23  COURT REPORTER:  Julie L. Monette, RMR, CRR, CRC
                        (860) 212-6937
24
  Proceedings recorded by mechanical stenography, transcript
25  produced by computer.
```

```
1                    (Transcripts excerpt follows:)

2                     *     *     *     *     *

3                          9:23 A.M.

4           THE COURT:  All right.  We're here for sentencing in

5    United States versus Kyle Fasold.  20-CR-193 is the case

6    number.  Let's begin with having counsel state appearances.

7           MS. GIFFORD:  Good morning, Your Honor.  Nancy Gifford

8    on behalf of the Government.  To my right is Special Agent Ryan

9    Mahar from the Department of Homeland Securities, and to his

10   right is AUSA Daniel Cummings.

11          MR. CUMMINGS:  Good morning, Your Honor.

12          MS. GIFFORD:  Just want to note for the record, Your

13   Honor, there are three members of the Plainville Police

14   Department present as well:  Officer Evelyn Rodriguez, Officer

15   Jessica Guerrette, who is also the school resource officer for

16   the Plainville High School, as well as Detective Sergeant C.J.

17   Roper.

18          THE COURT:  Welcome folks.

19          MR. WILLSON:  Your Honor, Charles Willson of the

20   Federal Defender's Office here with Mr. Fasold.  And I know --

21   I haven't had a chance to check in with them, but I believe he

22   has some family members present as well.

23          THE COURT:  All right.  Well, welcome.  Welcome

24   everyone.

25          Okay.  I should also point out that Angelica Deniz of
```

1    the United States Probation Office is present with us in the

2    courtroom.  Officer Deniz is seated in the jury box.  She

3    authored the Presentence Report in this case.

4            By way of background, Mr. Fasold appeared before me on

5    September 29th, 2022.  At that time he entered a plea of guilty

6    to Counts One and Three of a three-count Indictment.  Count One

7    charges production of child pornography in violation of Title

8    18, United States Code, Sections 2251(a) and 2251(e).  Count

9    Three charges distribution of child pornography in violation of

10   Title 18, United States Code, Sections 2252A(a)(2) and

11   2252A(b)(1).

12           A Presentence Report was prepared for the Court by

13   Officer Deniz on behalf of the Probation Office.  The initial

14   report was filed on December 12th of 2022.  The final report

15   was filed on December 27th, 2022.  There was also an addendum

16   filed that day.  There's been a total of four addendums, and

17   the most recent was filed yesterday.

18           I've reviewed all of these materials.  I've consulted

19   with Officer Deniz.  I've reviewed her sentencing

20   recommendation.  I've reviewed the two memoranda filed by the

21   defendant, including all attachments, the letters that were

22   received yesterday.  I've reviewed the defendant's forensic

23   evaluation, medical evaluation, and a declaration from an

24   expert witness.  I've also reviewed the Government's Sentencing

25   Memoranda, and I have reviewed a large number of victim impact

```
 1   statements.  As of yesterday, I believe there were 15,
 2   including three for a single victim.
 3        Give me one sec, folks.  I just want to make sure that
 4   there wasn't one that came in that I missed.
 5      (Pause.)
 6        Yes, I did read this.  So I just wanted to be sure.  I
 7   know it's important that I read all the materials that are
 8   submitted to me.  There was a great deal of material this week,
 9   and I'm confident that I have.
10        All right.  I know we have folks on Zoom.  They're
11   welcome as well.  Just remember there are rules about not
12   recording the proceeding or broadcasting or anything like that.
13        Okay.  So here's how we're going to proceed today,
14   folks -- we kind of have a long day ahead.  I know there's a
15   lot of people who wish to be heard.  So here's how we're going
16   to proceed:  First, I'm going to talk about the Presentence
17   Report with the lawyers, and then I'll just briefly review the
18   maximum and minimum penalties that Mr. Fasold faces.
19        Mr. Willson, should I pronounce his name Fasold or
20   Fasold?
21        MR. WILLSON:  Fasold.
22        THE COURT:  Okay.  Thank you.
23        Then I will do what we call the sentencing guidelines
24   calculation.  After that, we will hear from victims or victims
25   representatives, those who wish to speak.  Again, I have
```

1    received all of the -- and read every word -- of all of the

2    victim impact statements, just as I've read every word or all

3    the material submitted by the defendant.  After that, we will

4    hear from the lawyers and from the defendant, if he wishes to

5    speak, and also from any persons that Mr. Willson would like to

6    present on behalf of the defendant.  And after that, I will

7    impose sentence.

8            Now, this is going to take quite some time I expect.

9    And we will take at least a couple of breaks at various times.

10   We'll wait and see how things go.

11           Let's begin, then, with the Presentence Report,

12   Counsel.

13           Attorney Willson, have you had a chance to review the

14   Presentence Report and go over it with Mr. Fasold?

15           MR. WILLSON:  I have, Your Honor.  Before we get to it

16   though, can I just add a couple points for the record --

17           THE COURT:  All right.

18           MR. WILLSON:  -- and make a couple inquiries?

19           Over the course of the case, I've submitted additional

20   materials that have been docketed.  I know the Court has

21   reviewed.  I'd just like to make reference to them.  And then

22   there's also one key piece of consideration that I believe the

23   Court has reviewed.  It's not docketed.  Great pains were taken

24   by the Government, the marshals, and myself to read -- try to

25   keep it as private as possible.

1          So what am I referring to?  Specifically, I know in a

2    prior filing I provided the Court with, under seal, photos of

3    Mr. Fasold's sacral ulcers.

4          THE COURT:  Yes.

5          MR. WILLSON:  And I wanted to just sort of bring that

6    back.  And, obviously, the Court is considering that in

7    imposing sentence today.  And then the one part I'm a little

8    more vague about on the records, and the docket is a little

9    less clear about, is a key consideration in the case is the

10   plunge that Mr. Fasold took while at Wyatt Detention Center.

11         After some significant effort, the Government was able

12   to obtain a video copy from a video camera inside the facility.

13   My understanding is that the Court has reviewed that.

14         THE COURT:  No, I have not seen that video.

15         MR. WILLSON:  Okay.  Then obviously my understanding

16   was incorrect.  I was under the impression that you may have

17   reviewed it with Marshal Bobnick.

18         THE COURT:  I did not see the video.

19         MR. WILLSON:  I'm going to have to give that some

20   consideration.

21         THE COURT:  What do you mean by you're going to have

22   to give that some consideration?  It wasn't submitted to me as

23   part of the sentencing, and I'm not sure why it's relevant to

24   the sentencing.  I mean, I'm well aware of Mr. Fasold's

25   condition.

1          MR. WILLSON:  Sure.

2          THE COURT:  I've read the medical reports that you've

3     submitted.  I'm well aware of what happened at Wyatt.  I have

4     read various medical records about it.  I'm not sure I need to

5     see anything else.

6          MR. WILLSON:  Well, Your Honor, one of the points that

7     seems to be having made is that Mr. Fasold somehow did that in

8     some effort to escape the consequences here, you know, escape

9     the consequences of the case.

10          THE COURT:  How is seeing the video going to inform

11     me?

12          MR. WILLSON:  Because I think the video is informative

13     in terms of the process that he takes, the deliberate nature of

14     it, and it's important.  I don't know how we can -- to be

15     frank, Your Honor, I almost don't know how we can go forward

16     without the Court having seen it.

17          THE COURT:  Well, I do.  But if you want me to look at

18     the video and it's brief, I'll do that.  This should have been

19     brought to my attention with your sentencing material.

20          MR. WILLSON:  I appreciate that.  My understanding is

21     that the Court had seen it.

22          THE COURT:  I don't know where you got that

23     information because I didn't tell you.  I didn't tell you that.

24          MR. WILLSON:  From a prior conversation.

25          THE COURT:  In a prior conversation with me?  I never

1   told you I'd seen the video.

2          MR. WILLSON:  I believe you.

3          THE COURT:  Nor do I believe I have to see the video.

4   If you want me to see the video, bring a copy at the break, and

5   I'll look at it.

6          MR. WILLSON:  All right.  I'll consider it and see if

7   I can arrange that.

8          MS. GIFFORD:  If I could just note, Your Honor, I

9   don't think the Court needs to see the video.

10          THE COURT:  I don't either, but Mr. Willson wants me

11   to see the video.  I'm going to be clear.  If you want me to

12   see the video, you have to bring a copy at the break, period.

13   That's it.  What's next?

14          MR. WILLSON:  In terms of the PSR, I've had an

15   opportunity to review the PSR with Mr. Fasold.  After the first

16   disclosure or first draft of the PSR, we were able to review it

17   over Zoom while he was at the facility in South Carolina.  He

18   had an opportunity to read a significant portion of it.  I've

19   summarized some of the portions particularly concerning the

20   guidelines, things of that nature.  And then we had an

21   opportunity to discuss the second disclosure of the PSR to talk

22   about the addendum.  That is the first addendum that really,

23   you know, addresses the objections head-on and presents the

24   Probation Office's point of view.

25          There were a series of additional addendums, all

1  important but different in nature.  Some of them make reference

2  to the victims' letters that were provided under separate

3  cover.  They're not with the addendum.  He's had an opportunity

4  to review some of those.  In my meeting with him yesterday, I

5  did not have all of them.  So he's had an opportunity to review

6  those.  And so I think we're ready to go as far as that's

7  concerned.

8          THE COURT:  Great.  Okay.  So, Mr. Fasold, Mr. Willson

9  tells me he's reviewed the Presentence Report and various

10 addenda with you.  Is that true, sir?

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  Okay.  And you personally read the

13 Presentence Report?  Is that true or not?

14         THE DEFENDANT:  We reviewed it together, yes.

15         THE COURT:  You at least believe you have an

16 understanding of what the Presentence Report says?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  All right.  Do you need any more time to

19 review the Presentence Report?

20         THE DEFENDANT:  No, sir.

21         THE COURT:  All right.  So -- and you understood the

22 Presentence Report?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  All right.  Mr. Willson, at this time does

25 the defendant have objections to the factual statements in the

1    Presentence Report?

2          MR. WILLSON:  No, Your Honor.  I believe I pointed out

3    a number of changes big and small.  All have been addressed.

4    Really now we're talking about the legal aspects of it, the

5    guidelines, the overall presentation within it, and the

6    objections I've made with that regard.

7          THE COURT:  Thank you.

8          Does the Government have any objections to the factual

9    statements in the Presentence Report?

10         MS. GIFFORD:  No, Your Honor.  Thank you.

11         THE COURT:  All right.  There being no objections to

12   the factual statements in the Presentence Report, I adopt those

13   statements as my findings of fact.  I accept the signed Plea

14   Agreement that was filed on September 29th, 2022.  I'm

15   satisfied that the agreement adequately reflects the

16   seriousness of the actual offense behavior and that accepting

17   the agreement will not undermine the purposes of sentencing.

18         All right.  Mr. Fasold, when you pled guilty, I

19   explained to you that you face the following maximum and

20   minimum penalties in this case:  With respect to the child

21   pornography production count, which is Count One, you face a

22   minimum penalty of 15 years in prison and a maximum penalty of

23   30 years in prison.  With respect to Count Three, the

24   distribution count, you face a minimum penalty of 5 years in

25   prison and a maximum penalty of 20 years in prison.  With

1   respect to terms of supervised release, on both counts the

2   maximum term of supervised release is life, and the minimum is

3   5 years.  You're not eligible for probation in this case.  You

4   face a maximum fine of $250,000 on each count.

5          You also face several different kinds of what we call

6   assessments.  First of all, there's a mandatory special

7   assessment of $100 on each count for a total of $200.  Also,

8   under the Justice for Victims Trafficking Act of 2015, if I

9   were to find that you were not indigent, you'd face an

10  additional assessment of $5,000 per count, so that's $10,000.

11  You're also subject to the Amy, Vicky, and Andy Child

12  Pornography Victim Assistance Act of 2018, which under the

13  terms of which you face an assessment of up to $50,000 on Count

14  One and up to $35,000 on Count Three.

15         So restitution is mandatory in this case.  I

16  understand from the Government that they would like to defer

17  the determination of restitution in this case; is that right?

18         MS. GIFFORD:  Yes, Your Honor.  It's a bit of an

19  organizational issue just getting everybody prepared for today,

20  so if I could have some time so I could make sure I explained

21  to everybody the restitution options and determined if there

22  are any requests, that would be helpful.

23         THE COURT:  All right.  I don't have -- Mr. Willson,

24  any problem with that?

25         MR. WILLSON:  Your Honor, as far as I can recall, I

1    don't think I've been provided any numbers, claims about

2    restitution.  So I think I'm fine doing this whenever the Court

3    wants to.

4              THE COURT:  Okay.  Very well.

5              So what if we were to do this, Attorney Gifford:

6    Would you be able to provide a kind of a status report as to

7    where things stand on restitution and with any agreements you

8    might have reached with Mr. Willson about that -- I don't

9    know -- 30 days, 45 days?

10             MS. GIFFORD:  Forty-five days would be great, Your

11   Honor.

12             THE COURT:  How about February 28th?

13             MS. GIFFORD:  Yes, Your Honor.

14             THE COURT:  All right?  So at that point Attorney

15   Gifford will file a status report on the docket regarding

16   restitution, any requests that have been made, any agreements

17   that have been reached, and any proposal for further

18   proceedings.  And I'll wait to see that before scheduling a

19   hearing, which, as you know, I -- ordinarily under the statute

20   I have 90 days.

21             MS. GIFFORD:  Thank you, Your Honor.

22             THE COURT:  Any objection, Mr. Willson?

23             MR. WILLSON:  No, Your Honor.  That's fine.

24             THE COURT:  Okay.  That's how we'll handle restitution

25   in this case.  All right.

1    With regard to forfeiture, Mr. Fasold, you also face a
2    forfeiture of the various devices described in the Plea
3    Agreement, which include a camera -- various cameras and
4    recording devices, iPhone, iPad, laptop, a couple of laptops it
5    looks like, and a software drive.  I guess I should say a
6    hardware drive.  I granted a preliminary order of forfeiture
7    with respect to these items on January 4, 2023; and forfeiture
8    of your interest in these items will become final with the
9    judgment in this case.

10    All right.  Does counsel have any correction to the
11    Court's statement of the minimum and maximum penalty?

12    MS. GIFFORD:  No, Your Honor.

13    MR. WILLSON:  No, Your Honor.

14    THE COURT:  All right.  So turning next to the
15    sentencing guidelines, Mr. Fasold, one of the things that the
16    Court's required to consider in imposing any sentence is a body
17    of advice that comes from the United States Sentencing
18    Guidelines.  The guidelines are issued by the United States
19    Sentencing Commission, which is an agency in Washington, D.C.
20    They provide me, as the sentencing judge, with guidance or
21    recommendations on what would be a fair and just sentence in
22    your case by examining the type of offense involved.  There is
23    a guideline for the production of child pornography and also a
24    distinct guideline for the distribution of child pornography.

25    Those guidelines direct the Court to consider certain

1    characteristics of the offense.  They also direct the Court to

2    consider the nature and extent of the defendant's criminal

3    record.  The end result of the process of applying the

4    guidelines in a particular case is to point the Court to a

5    range of months of imprisonment that the Sentencing Commission

6    has decided would be appropriate in a case like yours.  I'm not

7    required to sentence you within that range, but I do have to

8    calculate accurately and consider it together with other

9    factors which I will explain later today when I sentence you.

10            Okay.  So let me ask, did the parties want to be heard

11   further on the guidelines calculation in this case?

12            MR. WILLSON:  Your Honor, just briefly.

13            THE COURT:  Sure.

14            MR. WILLSON:  And I think you already said this, and I

15   just want to make sure.  We had an unusual briefing schedule in

16   this case.  There was a big effort by both sides, and also by

17   the Probation Office, to move forward with this sentence, you

18   know, as relatively promptly as we could.  Part of what

19   happened is I filed a brief late yesterday, in fact, late

20   yesterday evening.  And I just want to make sure the Court had

21   an opportunity to read it.

22            THE COURT:  I did.

23            MR. WILLSON:  Thank you.  And I know I made

24   significant reference to a case from Ohio.  We'll talk about

25   the value of that.

1          THE COURT:  The *Close* case.

2          MR. WILLSON:  The *Close* case, exactly, which, while

3     the indictment in that case was crafted a little bit

4     differently than the one here, it does go further to my point.

5          And I'll just make the broad points again, which is

6     that the role of the guidelines in this case, the prominence

7     that is given to them I view as risking procedural error in

8     producing a sentence that is unreasonable.  I've made that

9     point in my objection letter.  I continued to make it, I

10    believe, in my Sentencing Memo and in my memo that I filed last

11    night.

12         I understand that there is *Crosby* and that *Crosby*

13    provides the Court with essentially direction.  The Court can't

14    ignore about how to handle sentencings in this district.

15         I was, coincidentally, a lawyer who was at the Court

16    of Appeals in that window of time between *Booker* and *Crosby* and

17    was asked the question, along with John Danaher from the U.S.

18    Attorney's Office, about what should we do now, you know,

19    post-*Booker*.  So I understand the precedent, and the Court may

20    feel bound by the precedent.  But the time for that process has

21    past.

22         It's particularly concerning in cases where we have

23    sentencing guidelines that the courts have recognized are

24    problematic, that the Court certainly has the discretion to

25    depart on policy grounds.  But ultimately if we keep taking the

1  advice of something that is shown to be unreliable and we keep

2  going to that person -- or excuse me, there's an analogy

3  coming -- we keep going to that resource first in setting the

4  stage for a sentencing, it just doesn't procedurally make

5  sense, and I think it's objectionable.  All I can think of --

6  and this is probably a terrible analogy -- is if I have an

7  uncle who gives me advice and he gives me bad advice some of

8  the times, why would I go to that uncle first when there are

9  plenty of other resources?

10         And when we look at the statute, which really is how

11  we're supposed to handle sentencing, the guidelines is not

12  first, second, third.  It is down the list.  So why we are

13  still doing it first just does not make sense.  Unless the

14  Court has any other questions, I just wanted to state that for

15  the record.

16         The other part of it is I do complain about the PSR

17  here specifically in terms of -- and this goes further to my

18  point -- the, I say, redundant nature of some of the

19  presentation.  Everyone in this room is going to be heard.  And

20  that process is important, and there's a whole statute that

21  takes care of that.  And I understand the guidelines, you know,

22  require calculations and all these things.  But we have a

23  Presentence Report in this case where it is in part because of

24  Mr. Fasold's conduct, you know, quite frankly, but and in all

25  candor, but where the sentencing --

1          THE COURT:  Meaning the number of victims.

2          MR. WILLSON:  The number of victims.  That's exactly

3    what I mean.

4          THE COURT:  I was going to make that comment.

5          MR. WILLSON:  No.  And I recognize that but where the

6    guidelines, you know, is the horse driving the cart, when you

7    read that report.  I respect the Court's independence and

8    independent thinking.  Obviously, I've been in front of Your

9    Honor a vast number of times, and I know this is only the

10   beginning of the discussion we're having today.  But I make

11   that objection.  I stand by it and want it noted for the

12   record.

13         MS. GIFFORD:  Just very briefly, Your Honor, you know,

14   I read Attorney Willson's objection in the letter to the format

15   of the report, and I've also been in front of Your Honor a lot,

16   and often in cases with Attorney Willson.  And it is not

17   unusual for him to make an argument and I can nod my head.  I

18   disagree, but I can understand where he's coming from.  This

19   one is not that case.  This one has me puzzled.

20         There is the reflexive answer, which is the number of

21   victims, and the paragraphs devoted to each one is a direct

22   result of Mr. Fasold.  And, frankly, it could have been longer,

23   as noted in the PSR.  We could have identified -- we could not

24   identify everyone, so it's limited.

25         But from my perspective and from the Government's

1    perspective, I would have preferred more detail in each

2    paragraph.  Each paragraph contains a very succinct summary of

3    the fact about each victim and has their year of birth, the

4    location of the recording, the number of unique images, and

5    whether it satisfied the definition of child pornography, just

6    the basics.  I would have much preferred that it said something

7    like "Minor Victim X was a close friend of the Fasold's family

8    for ten years" or "This minor victim loved swimming and now

9    doesn't."  There's no detail.

10          There's nothing in error in the way this is set up.

11   It is consistent with the way the guidelines are and consistent

12   with the fact that Count One was a significant period of time

13   that Minor Victim 1 was recorded.  It captured not only Minor

14   Victim 1 but under the guidelines you have to capture everyone

15   else that was recorded during that same time period and in the

16   same fashion.

17          THE COURT:  Okay.  Thank you.  All right.  I'm going

18   to go ahead and make the guidelines calculation.  Then I can

19   comment on what counsel had to say.

20          So, first of all, the guidelines calculation is

21   complicated here, precisely because there are a large number of

22   victims and because of the rules in the guidelines for handling

23   that.  There are 27 minor victims.  But that doesn't count all

24   of the victims of Mr. Fasold's conduct because there were also

25   other victims who are not counted for purposes of the counts

1    themselves, adult victims in particular.  But the minor victims

2    were the focus of the Presentence Report.

3            And under Section 2G1.1(d) and Section 3D1.2(d) of the

4    guidelines, the minor victims could not be grouped because they

5    are separate victims with separate harms.  There were two minor

6    victims, Minor Victim 1 and Minor Victim 3, who were victims of

7    both -- in both counts.  And those, with respect to a single

8    victim, Counts One and Three for Minor Victim 1 and Counts One

9    and Three for Minor Victim 3, could be grouped, and were

10   grouped, because they involved the same victim and two or more

11   acts or transactions connected by a common criminal objective

12   or constitute part of a common scheme.

13           I'm not going to go through the calculation for each

14   victim.  I adopt the calculations set forth in the Presentence

15   Report and pretty much the same calculations made by the

16   Government with the exception that, in an abundance of caution,

17   I'm not going to apply either the offense characteristic for a

18   parent, relative, guardian, or otherwise supervisory control or

19   custody even though, at least in one case, I think it plainly

20   applies.  But I'm not going to apply it.  And I'm not also

21   going to apply the enhancement for abuse of trust that the

22   Probation Office applied.  So I'm not going to use either of

23   those enhancements.  In the end that makes no difference

24   whatsoever in the calculation.  But I will walk through what I

25   did or at least outline it.

1          So by my calculations, I just will walk briefly

2     through the numbers.  I find that the offense level applicable

3     to each victim group is as follows:  The Minor Victim 1 group

4     the offense level is 41.  The Minor Victim 2 group the offense

5     level is 38.  The Minor Victim 3 group the offense level is 39.

6     By my calculation, again not applying the enhancements that I

7     mentioned, the offense level for each of Minor Victims 4

8     through 11 is 36.  For each of Minor Victims 12 through 16 is

9     34.  For Minor Victim 17 it's 32.  For each of Minor Victims 18

10    through 23, it's 34.  And for each of Minor Victims 24 through

11    27, it's 34.

12         The way the math works when one does the grouping is

13    that, by my calculation, you get to more than five units under

14    the grouping rules; and therefore, you have to add 5 to the

15    highest offense level, which gets you to an offense level of

16    46.  I agree with the Government and Probation that Section

17    4B1.5(b)(1) of the guidelines applies because the offense is a

18    covered sex crime.  But the career offender enhancement does

19    not apply, in subsection (a) of 4B1.5 does not apply.  But the

20    defendant engaged in a pattern of activity involved in

21    prohibited sexual conduct, and so five points are added.  That

22    brings the offense level to 51.

23         Of course, as counsel know, there is no offense level

24    51 on the guidelines table.  The offense level -- the highest

25    offense level is 43.  43 would call for a term of life

1   imprisonment, but that exceeds the statutory maximum.  The

2   statutory maximum, when the statutes are stacked here, is 50

3   years or 600 months; and that becomes the guidelines range in

4   this case for imprisonment.  The guidelines term of supervised

5   release is 5 years to life.  The defendant is not eligible for

6   Probation.  The fine range is 50,000 to $250,000.  And the

7   assessments are as I previously stated when discussing the

8   maximum penalties.

9         So I will just address the comments of counsel.  I

10  didn't have any problem with the way the Presentence Report was

11  set up at all because I think it does comply with what the

12  guidelines require, which is to address each victim separately.

13  The reason there are so many victims is, of course, because of

14  what Mr. Fasold did.

15        The broader point about the place that the guideline

16  discussion occupies in the Presentence Report would concern me

17  if I didn't think the rest of the Presentence Report was

18  thorough, but I do think it's thorough.  And so I have no

19  problem with it.  The fact is that the Court is quite capable

20  and has a lot of experience setting aside the guidelines when

21  it thinks it's appropriate to do that.  And there are good

22  arguments for either setting aside or at least reducing the

23  significance of the guidelines in child pornography cases, as

24  you're well aware of.  And we will be discussing those

25  arguments.

1          So the number of pages occupied by the discussion of

2    the guidelines has no impact on the way the Court thinks about

3    sentencing.  I've been doing this long enough that that kind of

4    thing doesn't affect me.  I'm focused on what the statute

5    requires, as I believe we all are.  And so I'm not concerned

6    about the -- I felt that the Presentence Report was thorough

7    and appropriate.

8          And I'm also not concerned about the fact that under

9    the case law the Court's required first to calculate the

10   guidelines range.  It has to be done in some order, and whether

11   it's done first or last -- if it was done last, arguably, you

12   know, you'd be worried about recency.  So, again, I'm not -- I

13   don't share your concerns, Mr. Willson, about that.

14         And so anyway, that I think addresses the guidelines

15   calculation, unless counsel has objections beyond those already

16   set forth.

17         MR. WILLSON:  Your Honor, I'll just stand by the

18   objections I made previously.  I appreciate the Court's

19   remarks.

20         MS. GIFFORD:  Nothing from the Government.  Thank you.

21         THE COURT:  Thank you.

22         So for folks watching either on Zoom or in the

23   audience who are not used to a sentencing, federal sentencing,

24   much of what has been said may sound a little bit like we're

25   speaking a different language.  But now we've -- but they are

1   necessary steps the Court must take in every sentencing.  But

2   now we've kind of reached -- begun to reach the heart of the

3   matter.  I'm going to hear from the victims.  And as I said,

4   then we will proceed to hear from the lawyers and anybody that

5   Mr. Willson would like to present and Mr. Fasold himself.  And

6   thereafter, I'll impose sentence.

7                  *     *     *     *     *

8                    (End of excerpt)

9

10                  (Transcript excerpt follows:)

11                 *     *     *     *     *

12        THE COURT:  Okay.  Very well.  I think what will make

13   the most sense is for us to take about a 15-minute recess now

14   and then to return and begin with the defense presentation.  So

15   that will take us -- so start that around 11:20.  And then

16   we'll probably continue till about 12:45, see where we are,

17   take a lunch break potentially.  If we go faster than that,

18   then I might adjust that.  But I think that's what makes the

19   most sense at this point.  So we'll be in recess for 15

20   minutes.

21        Mr. Willson, do you think you're going to be able to

22   get me that video, or do you want me to get that video?

23   Because I can extend it.

24        MR. WILLSON:  I've been quietly thinking about it.  I

25   can consult with someone.  I can let you know after the break.

 1          THE COURT:  I can't hear you.

 2          MR. WILLSON:  Your Honor, I've been thinking about it.

 3    I'm going to consult with someone and let you know right after

 4    the break.

 5        (Recess from 11:06 a.m. to 11:42 a.m.)

 6          THE COURT:  Please take your seats.  I'm sorry that

 7    delay took longer than I anticipated.

 8          Mr. Willson, whenever you're ready.

 9          MR. WILLSON:  Your Honor, in some prior communications

10    I think there was some talk whether you wanted us at the podium

11    or here.

12          THE COURT:  I think it's fine that he be either place

13    at this point.  Yeah, so my Zoom expert is telling me you're

14    fine if you'd like to stay where you are.

15          MR. WILLSON:  Yeah, let's give that a try.  We just

16    want to be able to have Mr. Fasold close to me in case he wants

17    to tap me on the shoulder.

18          THE COURT:  Just as you know, I know you've got a

19    booming voice, but if you could pull that microphone a little

20    bit.

21          MR. WILLSON:  I will, and I'll probably take off the

22    mask at some point.

23          THE COURT:  Yup.  That's fine.

24          MS. GIFFORD:  Can I just do a quick housekeeping

25    matter?

1          THE COURT:  Sure, sure.

2          MS. GIFFORD:  Minor Victim 1 mentioned a name.

3          THE COURT:  Yes.

4          MS. GIFFORD:  I'm asking if we could have that

5     redacted.

6          THE COURT:  Yes, we can.  That can be redacted from

7     the transcript, Madam Court Reporter.

8          Yes, why don't we -- I'll order that that be redacted

9     from the transcript.  I assume there's no objection to that,

10    Mr. Willson?

11         MR. WILLSON:  No, Your Honor.  It's very brave; but

12    yes, I agree it should be redacted.

13         MS. GIFFORD:  Thank you, Your Honor.

14         MR. WILLSON:  Well, here we are.  So it's been a long

15    time coming.  You know, I -- one of the reasons I'm a good

16    defense lawyer is because I have empathy and I have sympathy.

17    And with every client, I try to find that.  You know, I try to

18    connect to them, you know, because it helps fuel the fire of

19    what I do, you know.  And sometimes it doesn't work out, you

20    know.  We just don't see eye to eye or just there isn't really

21    anything.

22         And historically -- and I've been doing this now for

23    over 20 years.  Historically, before I came to the Federal

24    Defender's Office in 2015, the clients with whom I had the

25    hardest time doing it was child porn cases, you know.  Child

1    porn cases are a group of cases unto themselves, you know.

2        When I get a call about a new arrest -- and that's how

3    I came to meet Mr. Fasold.  Nothing was set up.  There was no,

4    you know, plan between Attorney Gifford or anything else and

5    me.  I got a call.  There was a new arrest.

6        Normally when I get those calls, it's guns, it's

7    drugs, maybe some fraud.  And then you have sort of some other

8    random things that get prosecuted by the U.S. Attorney's

9    Office.  But, you know, there are the days when it's child

10   porn.  And a fair number of those cases are possession cases.

11       And, you know, it quickly goes to, why did you -- you

12   know, you start thinking:  Okay, why did this person have any

13   interest in it? assuming that, you know, the evidence is pretty

14   clear that they possessed it.  And you investigate that.  But

15   then within the area of child pornography, production is its

16   own thing.

17       And I'm going to say some things, you know, in --

18   about this case as compared to other cases that are going to be

19   upsetting to people in the room.  And I'm sorry about that.  I

20   am so sorry about what they have all gone through.  I'm sorry

21   about the delays.  You know, I'm going to blame the pandemic.

22   There's a lot of truth in that.

23       You know, and I'm also going to say that I take my job

24   very seriously.  I'm very devoted to it.  And when you have a

25   case like this, you got to do everything that you can, you

1    know.  And one of the things, you know -- and that's just

2    important, particularly in a case like this.

3          So when I got the call about this case pre-pandemic,

4    you know, just barely but pre-pandemic, pre-multiple suicides,

5    you know, and knowing Nancy Gifford -- we have a fine working

6    relationship -- I knew it would be difficult.  And one of the

7    things about the case is that it was unusual within the area of

8    production of child pornography.

9          Sadly, terribly, awfully, we've been dealing with the

10   dark web now for quite some time.  I've had other cases before

11   Your Honor specifically and elsewhere where that is in play,

12   that is at issue.  I don't know what to do about it.  I've had

13   clients who, you know, have even tried to help with an

14   investigation, but the stuff is maintained outside the United

15   States, in places that don't have extradition.  You know, it

16   creates this problem that is almost merciless in terms of its

17   long-term effects.

18         And so that's one of the reasons why I recognize here

19   that the distribution, although not a large number of images,

20   which is no comfort to the people who are distributed, is an

21   aggravating factor; right?  Because it's different from someone

22   who makes child pornography, just puts it on a shelf and does

23   whatever they do with it.

24         And, you know, but -- and again I'm going to say

25   something upsetting.  The number of images that were

1    distributed is not particularly high compared to other

2    distribution cases I've had.  You know, it is not unusual --

3    and again I'm talking about the world of total abnormality.

4    That's where we're operating today.  It is not unusual to have

5    a distribution case where, you know, it is a back-and-forth

6    discussion between two or more people, and they are sending

7    images back and forth on Kik or some application that we can

8    all put on our phone in about three seconds and afford people

9    the opportunity and there's ways to connect.  It's just

10   mind-boggling.

11           I stand here normally about guns and drugs and we talk

12   about the drug epidemic.  Whether you want to call it the war

13   on drugs or the overpunishment or the failure, whatever you

14   want to call it, it's mind-boggling.  But in this world, the

15   world of child pornography, it has its own thing.

16           But a critical factor when we look at the law -- and

17   that's where I go to today is the law.  If I live in the world

18   of emotion, I will get about five minutes through it and I will

19   be a puddle, you know, because I coached my kids, you know.

20   Swimming's never been a big thing, and I know it is a big

21   thing.  I've had people involved with swimming confront me

22   about this case that are not, you know, victims.  I've had

23   people in my church ask me, you know.

24           And as a defense lawyer, you get the question at

25   cocktail parties, "How do you represent someone you know is

1  guilty?"  My answer to that depends on my mood, you know.  But

2  I don't have people that come up to me and say, "How do you

3  represent that guy?" you know.

4      And I do it because if I didn't, he would be alone.

5  Now, he's very fortunate to have a couple of family members

6  here, and we're going to hear from one of them at the end of my

7  remarks.  But that is essentially who Mr. Fasold is, is someone

8  who is alone.

9      But, you know, there is no sympathy for Mr. Fasold

10  today in this room.  You know, and, frankly, there is no

11  sympathy in the law.  When we look at the statute, which I want

12  to grab and have in front of me, when we look at the statute,

13  it's a list of factors that every court has to consider in

14  deciding the sentence.  No matter what the sentence is for,

15  whether it's selling crack cocaine, possessing a firearm,

16  shooting somebody, robbing a bank, whatever it is -- there is a

17  list of factors I usually put near the front of my memo so I

18  have it handy.  There we go.

19      And there's missing words from this.  One is the idea

20  of sympathy.  One is the idea of mercy.  Those words are not in

21  here, the idea of sorrow.  Those words aren't in there.

22  Because what it forces us to do, frankly forces Your Honor to

23  do, is to come to this and try to figure out an answer that

24  addresses everything.

25      You know, everyone's had a right to speak.  You know,

1    before when we were planning this out today, the scheduling

2    aspect of it, I thought they should go first because they've

3    waited long enough, you know.

4         And another thing about that wait, there's a couple

5    people that mentioned he's never expressed remorse about

6    anything.  I will take responsibility for that.  Until someone

7    pleads guilty, I tell them to be quiet.

8         I get calls from the media saying, "Hey, you want to

9    make a statement?"  And in this case in particular, you know,

10   it's one of the ones that stands out more.  And I don't say

11   anything, you know, about this case even though I could say,

12   "Oh, he is a broken man," you know, the things that I wrote

13   about in my memo that I know are coming, you know, as we work

14   through the process of working a case.

15        But -- so when he got arrested, you know, the first

16   person he meets who's trying to help him -- and I know Ryan

17   Mahar was a gentleman.  I have no complaints about what they

18   did that day.  But the first person who's really on his side --

19   and someone has to be on his side; that's how due process

20   works -- is me.  And the first thing I say to him is, "We are

21   not talking to anybody.  And we're not talking to anybody until

22   either you're going to testify at a trial," which very early it

23   was obvious that wasn't going to happen, "or when you plead

24   guilty."

25        And even after that, I'm not going to have my clients,

1    and especially in a case like this where so many people are so

2    deeply hurt, so deeply wounded, you know, and need the help

3    that some of them clearly are already getting and I commend

4    them for it, been going to therapy and expressing things,

5    getting together and talking about how much they hate him --

6    okay.  You know, those are the things that can help these

7    people.  Him saying he's sorry, which he's going to do and

8    which we've done and which he has expressed to people who

9    evaluated him, which he expressed to Officer Deniz during the

10   interview, his remorse, his regret, you know, there's

11   acceptance of responsibility, I suppose, but the statute

12   doesn't recognize that.

13          So what are we talking about?  We're talking about, I

14   think, two primary things:  the seriousness of the offense, you

15   know, and then what is going to happen going forward.  The

16   seriousness of the offense, again within the realm of

17   production of child pornography, I don't know how to categorize

18   it, but the lack of physical contact is something the law

19   recognizes, you know.

20          I am having quite a stretch right now.  On Wednesday

21   in another case with Nancy Gifford, although someone was

22   filling in for her, I had a client who pled guilty to

23   production of child pornography.  It involved physical contact.

24   And it is -- it is different than this.  You know, I don't -- I

25   don't want to put people's pain and suffering on the spectrum,

1    but it is different.  I have another one on Tuesday, also with

2    Nancy Gifford, where a guy is going to be sentenced for

3    production of child pornography that involves contact, and it

4    is different than Mr. Fasold's case.

5         And what we see in the law is that when contact is

6    involved -- and by "contact," I'm going to be a little graphic

7    for a second, sexual assault is often involved -- the sentences

8    are longer.  They are higher.  That is where the maximums are

9    coming into play or at risk.  And that's one of the reasons why

10   we've made -- I have made the request that I have in terms of

11   what his sentence should be is because his case is not there.

12        When the case first came in, I thought about

13   voyeurism.  My only experience with cases about voyeurism is in

14   state court.  Sometimes you hear in the news a camera is found

15   in a Starbucks.  I shouldn't say Starbucks.  That's not fair.

16   But in a cafe bathroom a camera was found.  It was found in

17   there when they went in there or a camera was hidden in a car,

18   whatever, and you hear about these things.  And in state court

19   the consequences tend to be different, but the cases tend to be

20   smaller.  You know, that's definitely a big piece of it.

21        And a lot of the cases that you hear about don't tend

22   to involve children in the news.  And that's why we are here,

23   you know, let's be candid.  I don't know if this was an

24   all-adult victim case if we would be here.  I'm not sure what

25   the, you know, jurisdiction of the U.S. Attorney's Office would

1   be in that situation.  But that was part of my thinking at the

2   time.

3          And it turns out, you know, that there is this case

4   that I submitted to the Court last night that the U.S.

5   Attorney's Office knows about.  It is the closest thing that we

6   can think of.

7          Now, why do we care about what another case says and

8   what happened to somebody else?  Well, when we look at this

9   statute, you know, one of the prongs is the need to avoid

10  unwarranted sentence dispar -- excuse me, ooh, I'm

11  struggling -- the need to avoid unwarranted sentence

12  disparities among defendants with similar records who have been

13  found guilty of similar conduct.

14         This is where we get into another layer of awfulness

15  that is the child pornography world, that this is not the only

16  case that's like this, that there is a case from Ohio involving

17  a man who was a Boy Scout troop leader and sounds like he had

18  maybe some kind of camera on his watch or something, a spy

19  camera.  And he would record boys changing clothes in swim

20  locker rooms.

21         When I was reading -- and in that case we don't have

22  like an actual written decision like we sometimes see in the

23  law.  And so the thing that I relied on was the prosecutor's

24  memo there; right?  Because it's the Government there; it's the

25  Government here.  And, again, because the law requires, in

1   consideration of two cases, the number of images, the number of

2   videos, the duration of the conduct all are greater than what

3   we see here.  And that's an important consideration.

4        Another important consideration is the fact that, from

5   what I read, the defendant appears to be physically able.  So

6   he is going to go off to prison, or has gone off to prison,

7   because it's about two years ago, three years ago, and his

8   experience is going to be radically different than it will be

9   for Mr. Fasold.  And we're -- I'm going to discuss that a

10  little bit more in a minute.

11       Now, one mitigating factor that's present in this case

12  that's apparently not present here is that gentleman had been

13  sexually abused as a child.  But I know the Government often

14  takes the position that, you know, obviously, being sexually

15  abused as a child does not condone, excuse, or, you know,

16  anything later on.  I try to look, you know, be mindful of that

17  in considering that here.

18       So we have this case that in many ways is a good

19  comparison point.  And, frankly, one of the things that is

20  chilling about this, when I was reading this and submitting it

21  to the Court, is there is a sentence in the case where they

22  describe the evidence.  And if you change the gender from boys

23  to girls, you know, it could be a sentence that Nancy Gifford

24  would have put in her sentencing memo.

25       So in that case, the defendant received 360 months.

```
1   He had more than one charge.  They had a fixed guideline range
2   and the type of sentencing process where the judge is set -- is
3   told, "We really want you to come between those two numbers."
4   One was over 400 months.  The defendant asked for less than
5   360, whatever the bottom of their range was.  The case was
6   charged differently, meaning what's in the indictment there is
7   written a little bit different than what's in the indictment
8   here.  I don't -- you know, it would be troubling the idea that
9   writing an indictment differently would lead to radically
10  different sentences.
11          So I use that case as a guidepost.  I use it as
12  direction, because it does all the things that the law tells us
13  to do when we compare those circumstances to this one.  And it
14  talks about a nature and circumstances of the offense that's
15  similar.  It's about voyeurism.  It's about long-term
16  voyeurism, creating videos; but in that case it's worse.
17          The history and characteristics of the defendant:  I
18  feel like we've heard a lot about that in terms of the
19  perspective of the people in this room.  You know, a lack of
20  trust that people now have is very -- and I don't just mean
21  trusting a person, although that's part of it, but like
22  trusting that they're safe when they go in the locker room, in
23  the public bathroom, go to a hotel or -- you know, that is
24  devastating.  And they feel duped by Mr. Fasold.  And their
25  feelings are understandable.  You know, there is a lie that he
```

1   was living in terms of who he was on the surface and who he was

2   to others and what was going on that is the crime that he

3   committed.

4           You know, but there is another aspect of this.  And in

5   sentencing some of the positives are positive, which is that

6   when we think about him going forward, he has indicated that he

7   wants treatment.  He spent a period of time at a facility in

8   Butner, North Carolina.  Obviously, the Court and the

9   Government knows as well, but I say this for the benefit of the

10  audience.  And that was the first place where he really got

11  some level of mental health treatment that started to address

12  things.  He had previously providing information voluntarily --

13  probably it's not something I would have encouraged -- about

14  being a voyeur when he was at one facility.

15          But when he went to Butner, he met a doctor who was

16  concerned about him, said there was much work to be done.  And,

17  you know, that is what we are hoping will happen in the future

18  is that someone will continue to work with him, because one of

19  the things we've learned, regardless of the crime, is that

20  where someone is open to treatment and willing to make changes,

21  that, under the law, under studies, would indicate that there

22  is a greater likelihood of success when we worry about issues

23  of recidivism, protecting the public, and are they going to do

24  this sort of thing again, you know, to be quite blatant.

25          On the physical side, you know, standpoint, I think

 1   the Government in its brief -- and one or two other people made

 2   a fair point, but there is on this is whether he physically can

 3   do this again.  The facts that we see in this case in terms of

 4   the locker room and what happened at the locker room does not

 5   realistically seem physically possible.  The real concern

 6   probably would be him doing something on the internet,

 7   accessing images, contacting people, what have you.

 8           You know, I'm going to be totally honest here and say

 9   by the time he gets out of prison, regardless what the sentence

10   is, it is hard for me -- and I'm going to guess hard probably

11   for anyone except maybe Agent Mahar in this room -- to predict

12   where we are going to be technology speaking, you know,

13   technology-wise, you know.  So but in the world that we live in

14   today, that's an obvious concern, you know, that that would be

15   available to him.

16           But keep in mind this:  The Mr. Fasold who leaves

17   prison, if that happens -- and I question whether it will no

18   matter what the sentence is -- but, if that happens, will not

19   be the Mr. Fasold who lied to all these people.  Hopefully he

20   will have gone to treatment and that will help.  But he will

21   not be this unknown, you know, the sheep's in wolf's clothing,

22   you know, which was a term that was used to describe the guy in

23   the Boy Scouts in Ohio in one of the things I read.  There is

24   no sheep's clothing anymore.  It is out.  It is out there.

25           Someone who works in the Probation Office like

1    Angelica Deniz will be supervising Mr. Fasold.  The Probation

2    Office has the ability to monitor electronic device use,

3    whether that's a cell phone, whether that's a laptop, or

4    whether it's some gizmo we don't even know about, you know,

5    that's going to be out in ten years.

6          That is different than what we had in the past.  So

7    there is a way to handle Mr. Fasold going forward, to the

8    extent it's necessary.  And obviously given his physical

9    condition, we're talking about things that are different than

10   what he did.  But to the extent that it is necessary, there's a

11   way to monitor it that also includes at-home visits, some

12   announced, some probably not announced.  And we all know, Your

13   Honor, Attorney Gifford, the people that do this on a

14   day-to-day basis, sometimes those at-home visits are the reason

15   why we end up back in court for a violation or things of that

16   nature.

17         And also I think the biggest things that, again, I

18   don't know how to value it is not just the stigma -- right? --

19   everyone now knows about his past.  He is never going to shed

20   that.  But as a society, there will be the monitoring of Mr.

21   Fasold.  His name -- and I'm assuming Google or some version of

22   it in the future will forever show who he is.  If he wants to

23   change his name, he has to inform a court, you know, of a

24   felony record.  He will be on the Sex Offender Registry for the

25   rest of his life; right?  We all know that that's coming.

1          And in terms -- in that registry, if you want, you can

2     go look and see if the person, you know, where they are, if

3     they're compliant.  You know, it's something, for better or for

4     worse, that I have to do with my job quite often, checking on

5     clients and checking on, you know, claims by the Government.

6     He will never be someone that cannot be found.  And, obviously,

7     for the next however long, he will be in the prison system.

8          Now, one of the things that's been sort of a mystery

9     till today, given his condition, he's had to be in a facility

10    in South Carolina for much of the time.  And that's not a

11    product -- it is partly a product of his making; but, like, it

12    is a decision by the marshals in terms of where to place him

13    and what facilities are willing to take him.  And you can't

14    really track his existence there as far as I know.  But after

15    today, soon after today, he is going to move in the Federal

16    Bureau of Prisons.  And he will have a federal inmate number

17    that will be publicly accessible, and people will be able to

18    track where he is through that system as well.  So there will

19    be no more hiding for Mr. Fasold.  There will be no more

20    sheep's clothing, you know.  He will forever be out there.

21          And now, why is that important?  It goes to the

22    questions of protecting the public.  The public was not

23    protected before he was arrested.  I'm not, like, looking to

24    blame anybody for that other than, frankly, Mr. Fasold.  But

25    the public trusted him, you know.  And again I go back to that

1    word "trust" because really that's the part that's eating away

2    at me here is, you know, but now that trust is forever lost.

3          And the way this plays out in the law is if we believe

4    that someone can be monitored, if we believe that someone can

5    be treated, if we recognize, which how can we not, that he does

6    not have the same physical capacity that he did before, the

7    need for the lengthy sentence that the guidelines would

8    recommend is pushed back against, you know.  And that's one of

9    the interesting things when we look at this statute here on

10   page 4 of my memo is we're trying to figure out the sentence

11   that is sufficient but not greater than necessary.

12         There is a retribution aspect in child porn cases that

13   isn't existing in when my clients sell drugs, you know,

14   typically unless someone overdoses and dies.  You know, and you

15   can feel that; and it's understandable, you know.

16         When I coached soccer, I worried about kids getting

17   hurt.  One of the things I could be heard screaming from the

18   sideline when the kid went down because they got caught in a

19   tangle was, "Get up.  Get up."  It's almost like the game was

20   stopping.  I never would have pondered anything like this;

21   right?  So, again, I want to recognize that trust.

22         But in sentencing, it is not about retribution.  It is

23   not about -- you know, I'll get biblical for a second.  It's

24   not vengeance.  You know, Vengeance is mine saith the Lord.  It

25   is not about those concepts.  It is about a broader, bigger

1    concept.

2             So I want to talk for a second about the need for the

3    sentences to meet certain purposes:

4             First, to reflect the seriousness of the offense.

5    This offense is serious.  I've already talked about that.  It's

6    serious within the world of federal criminal law.  It's serious

7    within the world of production of child pornography -- well,

8    within the world of pornography.  Within the world of

9    production of child pornography, it's a difficult one to weigh.

10   And I look to the *Close* case in Ohio to give us direction on

11   that, but obviously it's serious.

12            To promote respect for the law.  Congress in many ways

13   has taken care of that and the President who signed the law.

14   You don't produce child pornography and walk out of the

15   courtroom or walk out of jail; right?  We have mandatory

16   minimum obligations.

17            I could have a client who has a million kilograms of

18   fentanyl.  Their mandatory minimum prison term is less than

19   what it is in this case for Mr. Fasold.  So that is the --

20   where we see that law and promoting respect for the law is

21   observed is we start with that.

22            It always has struck me odd why 30 years sometimes in

23   physical contact cases, you know, are capped on production.

24   But it is.  And I know that it's 50 years here because of the

25   two statutes combined.  But there is respect for the law that's

1    going to come.

2         And I'm going to say -- I'm going to address a factor

3    that's a little bit different.  The respect for the law,

4    frankly, comes out of the hard work, you know, that has been

5    done by Agent Mahar and AUSA Gifford.  Anybody who's been

6    involved in this process, obviously they know, recognizes the

7    importance of law enforcement that in today's society, you

8    know, sometimes needs to be recognized a little bit more than

9    maybe it is otherwise.

10        But in the end, there is an aspect of respect for the

11   law where it is about -- and this is where your job, Judge, is

12   so hard -- about balancing everything.  Because if we just did

13   what the victims would want us to do because they tell us to do

14   it, you know, that isn't about the law.  They have an

15   opportunity to be heard.  They don't have an opportunity to

16   decide the outcome.  None of us, except for Your Honor, really

17   gets to decide the outcome.

18        So providing just punishment.  The guidelines, always

19   about punishment.  You know, there's a basis for a departure

20   here.  The Government recognizes that the basis is satisfied.

21   We just don't, I think, agree on the extent of it.  But the law

22   recognizes that.  And he is going to be punished.

23        Now, one of the ways he's going to be punished that is

24   different than my normal cases is he is going to be a pariah

25   not only in society, were he ever to be released, but he,

1    frankly, is going to be a pariah within the prison system.  He

2    has already been struck while at a facility that is geared to

3    like a hospital piece, you know, in having custody of

4    defendants.  He's already been struck for what he pled guilty

5    to, what he's accused of.  And, in fact, it's happened twice.

6    So there is that.

7         And I hate to say this, and I hate to be grizzly about

8    it, but if he thinks getting punched in the face was bad, you

9    know, who knows what's coming next.  He is going to go off to

10   the prison system where people who commit offenses involving

11   children are the bottom of the barrel, the worst of the worst.

12   You know, I know in our society we have a "lock them up, throw

13   away the key" thing, you know, mentality for some portion of

14   our population.  The law prevents us from adopting that in

15   court.  You know, there is a recognition in case law that where

16   someone is going to go and be more at risk in the prison

17   community, the judge has the discretion to go lower.  We see it

18   in a variety of types of cases.

19        There are cases where the defendant is exceptionally

20   small, you know, and looks like a child and comes across that

21   way.  There have been cases where someone's outward expression

22   of their sexual orientation of their, you know, gender manner

23   can be recognized.  And one of the areas it's recognized, both

24   in the guidelines and in, you know, broadly with variances, is

25   where someone's physical condition makes them more of a target,

1    which we see Mr. Wise talk about in his declaration.

2            And so we have a double, you know, whammy that awaits

3    Mr. Fasold, which is he's going to be in a wheelchair and he's

4    a sex offender.  Oh, now a triple whammy, involving children;

5    right?

6            And then we've got this other piece of Mr. Fasold that

7    I haven't fully wrapped my brain around, frankly, in terms of

8    how it's going to work because I've never had it before is

9    because of one of the ulcers he had on his body, we are told

10   that for the rest of his life he will be allowed to sit up for

11   two hours at a time, three times a day.

12           I can't imagine what it's like to be in a chair.  You

13   know, I think I've sat in one and wheeled around a room in one

14   at some point I'm sure, but I really can't imagine it.  I can't

15   imagine what it's like to be in prison.  And I can't imagine

16   what it's like to have this other thing.

17           You know, a long time ago, I had a client in

18   Massachusetts who had third-degree burns over more than 50

19   percent of his body, and he was blind.  And what had happened

20   was he had set fire to his home where his wife and his children

21   were.  And one of the things that can happen is you yourself

22   catch fire and have a heart attack as a result.  It can cause

23   blindness.  I never knew that until that case.  I was involved

24   with a large law firm suing -- I was at a large law firm suing

25   the Massachusetts Department of Corrections because they

1  couldn't accommodate his disabilities.

2          So when I think about that guy, which I do from time

3  to time when I have clients with physical conditions, I think,

4  okay, he had sort of an assistant.  It was another inmate who

5  was a very nice guy who would take him around.  And that's

6  probably what awaits Mr. Fasold, if he's lucky, is some inmate

7  will be assigned to help him move around when he needs to, has

8  to change his wounds.

9          And I'm not talking about a defendant who's a nurse --

10 right? -- who has any training other than within the facility;

11 right?  And as nice as that person may be, it's not a person

12 any of us would go to for medical care, for medical assistance;

13 right?  You know, that is his best future within the prison.

14         Now, is that -- is that fellow person going to know

15 about his charges eventually?  It's not hard to find out.  You

16 know, this sounds begrudging; but, like, at the end of today,

17 there's a very good chance, or maybe tomorrow, the U.S.

18 Attorney's Office is going to issue a press release about this

19 case.  And this will be all over the media.  You know, it will

20 be out there.  And that's a way to deter the public, I suppose.

21 And the public has a right to know things.

22         But whoever is with him in the future, all they got to

23 do is get on the phone and be like, "Hey, I got this guy that I

24 met in here.  His name is this.  Can you look him up?"  You

25 know, and that is the future that awaits him.

1          Because we have this statute, the idea that, you know,

2     "So what?  He's going to get his just desserts," that's not

3     what the law says.  Instead, this is something that the Court

4     can, and frankly should, consider.

5          The next purpose of sentencing is to afford adequate

6     deterrence to criminal conduct.  And there's two aspects of

7     this.  One is specific deterrence; one is general deterrence.

8          Specific deterrence is about Mr. Fasold.  All right?

9     It is hard to imagine how one sentence versus another is going

10    to really matter in that.  He is deterred either way, you know,

11    15 years, 30 years, 45, 50, whatever the number is.  And what

12    the law tells us -- let's go back to that idea of sufficient

13    but not greater than necessary.  If that can be satisfied by a

14    lower number, it should be satisfied by that lower number.

15         Then there's the idea of general deterrence.  Within

16    the federal criminal justice practice, that tends to be

17    recognized in certain types of cases more so than others.  We

18    don't -- plenty of studies have shown that the idea of general

19    deterrence, particularly in drug cases, you know, isn't super

20    effective.  But in tax cases where people aren't paying their

21    taxes, every time I have a client that gets sentenced for that,

22    we talk about general deterrence.

23         In the area of child porn, I don't see how it makes a

24    lot of sense.  And I say this, the reason why, because the

25    conduct is so outside of the norm.  Like if we think of our big

1   Social Security, all these people and we're thinking about

2   statistics, the people who engage in child porn defenses [sic]

3   are not only criminals, which maybe that's over here, but then

4   they are even further outside.  And I think the people that are

5   in that situation, they're hiding that they're doing it, you

6   know, in a very significant way.  Everyone here can attest to

7   that, you know, to the extent that it was hidden.  It's not the

8   person out on the street corner selling drugs who isn't, you

9   know, doing much to hide it.

10          And the abnormal nature of the behavior is such that

11  the processing of, you know, "Oh, I'm aware of this guy getting

12  this sentence or that guy getting that sentence and I'm thus

13  deterred," I don't know that it has the same impact.

14          I think there's an aspect of the mandatory minimum is

15  a way that society -- you know, Congress is trying to

16  deter society.  And it promotes respect for the law.  As to

17  general deterrence, I don't know that it fully works.  And this

18  might be an area where you and I, Your Honor, disagree.

19          To protect the public from further crimes of the

20  defendant.  Obviously, you know, that's a very significant

21  characteristic.  I think I've addressed it to some extent by

22  the remarks I've already made in terms of his physical

23  condition, the fact that he can be supervised, will be

24  supervised, wasn't supervised previously, are all indicators

25  that there is a way to protect the public that is available

1    other than just a, you know, a prison sentence that will end

2    things.

3           The kinds of sentences available, I think we all heard

4    that one when the judge described what the minimums and the

5    maximums are.

6           We've talked about the guidelines.  I have my views

7    about those.  I don't -- I think it's bad advice.  If you have

8    any questions, Your Honor, obviously I'll answer them; but I

9    feel like I've briefed that fully in my papers.

10          Then I get to the one that's there about unwarranted

11   sentence disparities, which brings me full circle back to the

12   case of Mr. Close, the Boy Scout troop leader out in Ohio.  So,

13   you know, outside of that case, the Government had a couple of

14   cases in its memo.  I think those are distinguishable.  And

15   it's hard to imagine a case that's much closer or any closer

16   than the *Close* case.

17          So can I have a second, Your Honor?

18          THE COURT:  Yes.

19      (Pause.)

20          MR. WILLSON:  Your Honor, can I have -- so I've got

21   two people who would like to address the Court.  One is Mr.

22   Fasold himself.  Also I was going to have his sister come

23   forward, if that's okay.

24          THE COURT:  Yes.

25          Come on up, ma'am.  Welcome.  Good afternoon.

1          MS. FASOLD HIBSON:  Good afternoon, Your Honor.  My

2   name is Kimberly Fasold Hibson.  I am Kyle's older sister by

3   two years.

4          It was a year ago yesterday that my father passed

5   away.  He never saw my brother again after his initial

6   arraignment three years ago.  I had to give my father's eulogy,

7   and I never thought I would experience anything ever harder

8   than doing that.  Standing here today is beyond my imagination.

9   I would never in a million years have ever expected to have to

10  stand here today and speak on behalf of my family.

11         If it would be okay, I would like to address the

12  families briefly?

13         THE COURT:  Sure.

14         MS. FASOLD HIBSON:  I would like to express my

15  heart-wrenching condolences to all of you.  I have a teenage

16  daughter.  We chose not to pursue whether or not she was among

17  your ranks.  She went through therapy, and she felt that it

18  would serve her no purpose.  But during this time period, my

19  brother and I had been fairly estranged, so we were only at

20  their house a few times.

21         So please know that me standing here and speaking

22  today in no way diminishes how I feel for you and the extent of

23  the hurt and damage that my brother has caused.  And I hope

24  that after today you are all able to start healing and finding

25  peace, especially all of the young girls who got up and spoke

1    today so bravely.  I'm so in awe of you.  So, again, on behalf

2    of my family, again, I do express my condolences and my sorrow.

3    And I hope that things get better for you all from here.

4           I'm not quite sure where to start.  Growing up, my

5    brother and I had a very normal middle-class upbringing, a very

6    close family, lots of friends, lots of extended family.  We

7    vacationed.  We participated in sports.  My dad coached our

8    leagues.  My mom drove us to all our activities.

9           And Kyle and I were very close.  We were only two

10   years apart.  We had very similar friend groups.  We both went

11   to private schools because they were brother and sister

12   schools.  His was all boys; mine was all girls.  So we had, you

13   know, a lot of similar friends.  And we enjoyed each other's

14   company.  He was a good kid.

15          I remember -- you know, they were speaking about

16   Kyle's lemonade stand.  Um, growing -- well, I would say as a

17   late teen, young adult, Kyle also participated in community

18   service activities.  There were many holidays where we had to

19   postpone our dinner because Kyle would be volunteering at a

20   soup kitchen or bringing food to a fire department or things

21   like that.  So his history of community service started prior

22   to the lemonade stand.  And I understand that's a double-edged

23   sword now, but he has always been one that was involved in his

24   community.

25          He worked at our local hometown restaurant.  It was

1  like Cheers.  Everybody knew him.  Everybody loved him.  He had

2  a very wide circle of friends.  He was just a great kid.

3      And then he moved to Plainville, and things started to

4  change.  We didn't see him as often.  He would come down.  He

5  wouldn't stay very long.  He started pulling away from us.  He

6  would -- there would be arguments with my parents that were

7  completely unwarranted, and thus became -- began a period of at

8  least 15 years where my brother and I had no communication

9  whatsoever.  We were completely estranged, my parents and I,

10  from my brother even though we never stopped trying to reach

11  out.

12      And it's ironic because so many of you today said that

13  he was your family and that -- and you all trusted him and felt

14  so close to him.  And I'm sure that most of you didn't even

15  know that we existed, his mother, his father, his sister.

16  We're good people.  And we loved Nicholas and Gianna, and we

17  wanted to be involved in their lives.  But we were just

18  completely shut out.  So I'm thankful in the fact that my

19  daughter was shielded from what you all experienced, but it was

20  incredibly painful for my parents and I not to know my niece,

21  my nephew.

22      Two brief examples:  My parents celebrated their 50th

23  wedding anniversary.  They were married 63 years in total when

24  my dad passed.  So my -- we weren't speaking, but I sent an

25  invitation.  Not only did they not show up, but there was never

1   even a response to the invitation.  And that just destroyed my

2   parents.

3          Another example is my niece Gianna, we didn't know

4   Gianna existed until she was three months old.  We were never

5   told.  We found out through a friend of a friend.

6          And so it wasn't just us during this period of time

7   that was becoming alienated from Kyle.  It was his extended

8   family.  It was his circle of friends.  He just, all of them,

9   like he just became somebody none of us knew.

10         And they were right.  Kyle was a chameleon.  He

11  developed this mantle of arrogance and, as my kids would say, a

12  topper.  If you did it, he did it better.  And if you got it,

13  he got it better.

14         And he was a perfect stranger to me.  And I did not

15  like him.  I loved him, and I hoped that things would change.

16  But I did not like him at all, especially because of the hurt

17  and pain he was causing my parents.

18         Several years prior to his arrest, we formed a very

19  tentative reconciliation and whereby, um, they would come down

20  the day after Christmas, the family, the four of them, and my

21  family, my husband, my children.  And we would meet at my

22  parents' house, and we would have the day after Christmas.  It

23  was uncomfortable, but it was worth it because we were getting

24  to see Nicholas and Gianna.  And so this continued until Kyle's

25  arrest.

1    I was at my daughter's first high school formal, and I

2    got a call from Chuck.  I had no idea who he was.  There was a

3    million kids all around, and I had no idea what anybody was

4    talking about.  As the facts came to light, I was devastated.

5    And please understand, I feel your hurt.  I didn't

6    know if my daughter was involved.  It was disgusting to me.  I

7    couldn't understand how my brother, who I grew up with, could

8    have done such a thing.  And I was really, really, really

9    angry.  But my mom said, "We have to help him.  He's my son.  I

10    know what he did is wrong.  But he's my son.  I can't turn my

11    back on him."

12    And through significant, um, psychotherapy and

13    counseling from my priest, um, I have learned a mantra that I

14    repeat to myself over and over and over again, which is "hate

15    the sin, love the sinner."  And it's not easy every day.  And

16    trust me, last night I was not happy.  But I think back to the

17    Kyle that I grew up with, and that's what allows me to support

18    him, to work with Chuck if necessary, to talk to him on the

19    phone.

20    I was given an opportunity to see him in the hospital

21    after he jumped at Wyatt.  And I know that it's easy to say,

22    "Well, he was just trying to escape the consequences of his

23    actions."  What he was trying to do was remove himself from

24    this world so that people could begin healing, his children,

25    his ex-wife, everyone affected.

1      Um, and he didn't try suicide just one time.  He tried

2  many times.  And there were at least three times, I believe,

3  where we weren't sure if he was going to make it through the

4  night.  And all I could do was to pray to God that his will was

5  done, that whatever God had in store for my brother was what

6  should happen.  And if that was that he was to take my brother

7  and he would pass away and then he would have to go face his

8  consequences, then I was okay with that.

9      But attempt after attempt after attempt, and he's

10  still here.  And so to me, I kind of think that God still has a

11  purpose for him here.  And I don't know exactly what that is.

12      I know that Kyle and I have talked at length about

13  what the other side of this will look like if at some point

14  he's able to get out.  And he has spoken -- ironically, the

15  last time we left here was, um, after the plea hearing.  And my

16  mom happens to be in a wheelchair.  And, um, the wheel came

17  off.  The rubber came off the wheel.  And some very nice I

18  believe they were marshals attempted to help me get the tire

19  back on.  And I didn't, so I had to run her flat to the car.

20      And later that week, I don't even know if Kyle knew it

21  or not, but we were talking on the phone.  And he's like, "You

22  know, being in a wheelchair," he's like, "I think maybe I could

23  work to maybe restore wheelchairs."  He's very mechanical.  He

24  said, "Maybe I could work to restore wheelchairs for people who

25  are in need."

1    He's talked about talking to people in his situation,

2  trying to be maybe a mentor.  "Listen, I've been there, done

3  that.  This is what you need to do."  So we talk often about

4  what he can do on the other side of this to be a healthy,

5  productive member of society.

6    So I ask that wherever he goes, he's given the

7  opportunity to continue therapy.  He did wonderful work with

8  Dr. Graney.  That's when all the layers of the onion peeled off

9  and I was able to say, "Oh, there's my brother.  Now I know who

10  you are.  I remember you."  It wasn't that, you know, arrogant

11  whatever.  So, um, I just ask that he be given an opportunity

12  to be productive, to receive whatever intervention he may need.

13    Unfortunately, my husband couldn't be here today.

14  He's actually an attorney.  He has court himself.  But my

15  husband and I will do whatever we can to support Kyle on the

16  other side of this.  I don't know what that will look like.  Of

17  course, my mom as well.

18    And I appreciate the prosecution.  I know this is not

19  a fun case.

20    I thank Chuck -- I'm sorry -- Attorney Willson.  He

21  gets my middle-of-the-night text messages and usually responds

22  right away.  And I appreciate his diligence in representing my

23  brother and everyone who's been involved in his care.  I know

24  he hasn't made it easy.

25    And I don't know what the future's going to look like.

1     But whatever consideration you can give him, I would

2     appreciate.

3           THE COURT:  Thank you very much.

4           MS. FASOLD HIBSON:  Thank you for your time.

5           THE DEFENDANT:  Thank you for allowing me to speak,

6     Your Honor.  I appreciate it.

7           To all the victims, their families, the community and

8     everybody, I am sorry.  I wish that I could do something to

9     help all of the people I have hurt, especially the victims of

10     my crimes and their families.

11           I read letters that my lawyer provided me; and while I

12     thought many times of the damage I've done to others, reading

13     those letters made it more clear and more real.  And, of

14     course, the people speaking today made it very real.  It was

15     not just the thought or wonder.  I will carry that forward,

16     just like I will today's hearing, for as long as I can.

17           I know my being sorry probably offers little, if

18     anything, to you.  This may be of little or no value, but

19     please know that this is not your fault.  You have no

20     responsibility for any of this.  Any one of you believes that

21     you are responsible or somehow to blame for this, you are not.

22     I am sorry for everything, including causing you to have that

23     feeling.

24           I want to thank Dr. Graney, who my sister mentioned in

25     her talk, who worked with me at Butner in North Carolina.

1          I want to thank my parents, my sister, and other

2   members of my family who have tried to support me.  I know I

3   have hurt you too, and I am sorry for that as well.  Thank you

4   for being there for me.  I love you.

5          My ex-wife and my children were home with me when I

6   was arrested.  My life crumbled that morning.  It was a false

7   life.  It was not real.  I hurt many people in creating it and

8   maintaining it, including many people I will never know, people

9   in Plainville, people who watched their kids swim, and many

10  others.  I am sorry for all of them -- or to all of them.  I'm

11  especially sorry to my children.  I will carry the shame,

12  guilt, remorse, and sorrow so long as I live.  Thank you.

13          THE COURT:  Thank you, sir.

14          MR. WILLSON:  Your Honor, any questions?

15          THE COURT:  Nope.

16          MR. WILLSON:  Okay.

17          THE COURT:  Thank you.  All right.  Attorney Gifford,

18  I certainly want to afford you equal time.  Can I -- and I

19  don't -- perfectly fine if you want to take more time.  Just

20  for planning purposes, I would like to get some idea of how

21  much time you think you might need.  And in no way am I trying

22  to rush you.

23          MS. GIFFORD:  No, I think -- thank you, Your Honor.

24  Absent the Court having questions, I think I would be about 15,

25  15, 20 minutes tops.

1          THE COURT:  All right.  Then what I would propose to

2     do is to continue.  And then what we'll do is we will, at that

3     point, take just 15 minutes; and then I will come back and

4     impose the sentence.  And I think that way we can shorten the

5     day for everyone.  And I think that's the best way to proceed.

6          So I'll hear from Attorney Gifford now.

7          MS. GIFFORD:  Thank you, Your Honor.

8          So just a quick discussion about the *Close* case.  Case

9     comparisons are difficult.  I had one judge just last month

10    tell me it is the least persuasive of the 3553 factors for him

11    because there are always distinctions, and that's certainly my

12    experience with this case in particular.

13         But the *Close* case is a good one to discuss.  And to

14    be clear, I was not surprised when the filing happened last

15    night and the case was reported by Attorney Willson.  We had

16    discussed the case before.  I had discussed it with some of the

17    victims as well.  So we've known it was out there, and there

18    are some significant similarities.  There's, of course, the

19    swim instructor similarity and the surreptitious recordings and

20    distributions on the dark web.

21         In some ways *Close* was the worst offender.  He engaged

22    in the conduct longer.  I think he was more in the line of

23    seven years, and he had a much more significant collection of

24    child sex abuse material.  In some ways Fasold was worse, in my

25    view, because he recorded his family and friends, people who

1   welcomed him into their homes.

2        The big distinction in the *Close* case, then, from my

3   view, is procedural.  And that's that it was an 11(c)(1)(C).

4   And just for the members of the audience today, that's a plea

5   in which the Court's bound, if it accepts the plea, it's bound

6   to give a sentence that everyone has agreed is the range.  And

7   in that case it was 324 to 405.

8        So that's where the question comes into mind as to how

9   much we can look at it.  But certainly there are significant

10  factual similarities.  But our posture's different.  We have an

11  effective range of 15 to 50 years, all of which are, of course,

12  long sentences, anywhere in that range.

13       A couple other quick points to respond to Attorney

14  Willson's statements.  He's right, we had a plea earlier this

15  week.  While it was a contact offense, two victims.  The case

16  that's going to be sentenced next week, two years of

17  production, one victim.

18       So, again, this goes to the point of, you know, we can

19  look at all these cases.  As I often will say, it's a spectrum

20  of horribles.  That's pretty much my case docket.  And I can't

21  say one is worse than the other.  You can't hear these victim

22  statements and think that that harm that they are really

23  suffering, and I don't think anyone is saying this today, but

24  it's a real and present and certainly hard to put on a spectrum

25  of when we compare it to other cases.

1          I will just bicker a little bit.  I think Attorney

2     Willson was going through the 3553(a) factors and noted there's

3     sort of no place for remorse.  That's history and

4     characteristics of the defendant.  You know, a defendant that

5     comes in and from the beginning is saying "I'm sorry" and

6     showing real concern for the victims of the offense, that's the

7     place where the Court may consider that it is reflected in the

8     3553 factors.

9          But all that said, today's a solemn day.  No matter

10    what happens today, there is no joy.  There's no joy in seeing

11    so many victims or family members in court.  There's no joy in

12    seeing Mr. Fasold's sister and his mom have to be here today.

13    There's no joy in seeing Mr. Fasold on a stretcher.  And I

14    believe firmly that every person present in the court today,

15    every person, would do anything to turn back time and prevent

16    all of this from happening.  Unfortunately, none of us have

17    that ability.  Kyle Fasold is the only one who could have

18    stopped it.  He was the only one responsible.

19         And I was heartened to hear him say that in his

20    statement today, because as is often the case in child

21    exploitation cases, some victims and victims families shoulder

22    some private guilt or shame.  And no matter how many times they

23    talk to Special Agent Mahar, who we heard a lot about today,

24    and all the support that they get from counselors, it's still

25    working.  You're still thinking about, Why didn't I follow my

gut?  Why didn't I do X instead of Y?  Why didn't I say no to
that sleepover?

         And I just want to make it clear that the only person
who's to blame is Mr. Fasold, and he's the only one who could
have done something different.

         So it is fairly rare to have a case like this in which
the guidelines are at the statutory maximum, and it's rare to
stand before a court and talk about these undeniably long
sentencing ranges.  I'm just going to talk about a few things
that I think I wanted to highlight as to why the Government's
recommending a sentence that's towards the higher end of that
range.

         First is the number of victims, not just faceless
numbers as were in the PSR.  Each number is a child, primarily
little girls, girls who loved swimming or playing with friends,
who had family, family who had to be told four children who
still have their images and Mr. Fasold's lurid comments on the
dark web.  We cannot get those down.

         In addition, the number of offense conduct victims who
doesn't tell you the whole story because there are several
minor victims who were recorded outside the time range; so
they're additional victims.  We also have young ladies and
women who Mr. Fasold also recorded who are not reflected in
that count of 27 victims.

         Second, there is the level of deception.  There is

1    something sinister about the greetings and hugs prior to a swim

2    meet when he knew he had just put a recording device in that

3    locker room or hosting a community event and then hiding a

4    camera in your home bathroom to record children and adults as

5    they changed.  Sharing meals and conversations with a man who

6    the whole time was recording your child.  How do you come back

7    from a violation of that kind of trust?  How do you not lose

8    faith in yourself, in your ability to believe your own eyes and

9    your heart?  How do you not lose faith in humanity?  And then

10   think of all those same questions from the perspective of a

11   young child, a preteen or a teenager.  How does this shape

12   their world and themselves and others?

13          The next factor is the duration.  He was

14   surreptitiously recording these children and adults for two and

15   a half years.  That is a long time to lead a double life, to

16   pretend to be virtuous and giving when you were stealthily

17   manipulating the situation for yourself, when your virtue was a

18   mask for your crimes.

19          There was no sign of stopping until law enforcement

20   arrived at his door.  And I say no sign in that the hidden

21   cameras still had recently recorded images that he had not yet

22   had a chance to upload to his OneDrive account.

23          The next area I wanted to talk a little bit about, and

24   Attorney Willson reflected on as well, is about future risk and

25   specific deterrence.  I think Attorney Willson said something

1    like, he is deterred either way.  He also mentioned in his

2    Sentencing Memo that Mr. Fasold had no idea of the enormity of

3    the consequences at the time of the -- he was doing this

4    conduct, meaning the mandatory minimums.

5            And I will agree, he may not have had any idea that he

6    was facing such substantial mandatory minimums; but from my

7    perspective, that is a minor consequence compared to the larger

8    one because his crimes were intrinsically interwoven with his

9    life.  He was recording his friends' children.  They were his

10   kids' friends.  They were his family members.

11           He knew from the first moment -- he had to have

12   known -- that if anyone found out about the images that he hid

13   on his computer or found a device that he had recently set up

14   or linked any of the images online back to him, he had to know

15   his whole world would have been impacted, his family, his

16   friends, and his carefully crafted identity as a family man and

17   pillar of the community.  He had to know that it would all come

18   tumbling down.  And that did not deter him.  So when we talk

19   about specific deterrence, I have real concerns today.

20           In addition -- and I did not address this in my

21   Sentencing Memo.  It was only last night I was reading through

22   the adult psychosexual evaluation from Empire.  And I did have

23   additional concerns after reading that because I feel like it

24   exhibited a real lack of self-reflection in his comments with

25   the evaluators.

1           On -- I believe it's right on page 2, he says that he
2     was not interested in minors but he saw the opportunity.  He
3     was just a voyeur and denied interest in child sex abuse
4     material.  He indicated how he was highly bonded with his
5     children in that he would do anything for his kids, including
6     stopping drugs and alcohol.
7           And how do you go from that point to then say you put
8     your children's lives at risk; you used your children's lives
9     to be able to manipulate and access child abuse?  Also, how do
10    you say you're not interested in minors when online you're
11    talking about your interest in 10- to 12-year-olds and you're
12    accessing a dark web forum designed for child sex abuse
13    material?
14          So that report concerns me.  Oftentimes in these
15    reports, as this one does, they talk about risk evaluation
16    tools; and I usually will criticize them, I have to say.  I
17    don't usually find them helpful.  In here, though, I still
18    question them because they're only as good as the input they
19    receive.  But even under that light, they're still finding Mr.
20    Fasold to be an average risk.
21          When you look at the Static -99, he's an average risk.
22    When you look at the Stable evaluation, he's a moderate risk.
23    When you look at the CPORT, it says that he falls within the
24    expected range of risk spectrum for any kind of sexual
25    recidivism.  When you look at the SSP2, which is designed to be

1  a measure of pedophelic sexual interest among men, the range of

2  that test is 0 to 5, and they found him to be a 4.  So specific

3  deterrence is important in this case.

4       And while his future dangerousness should include a

5  reflection on his current medical condition, and I think it was

6  mentioned here earlier, I have to note that that condition's

7  not going to limit him from hiding a camera in a bathroom or

8  accessing the dark web.  And while Probation and conditions

9  that monitor devices are helpful, they're only as good as

10  knowing those devices exist.  And it's not uncommon for

11  individuals under these types of conditions to have devices on

12  the side that Probation has to find.

13       One quick remark on general deterrence, which is an

14  important factor from the Government's perspective, when law

15  enforcement arrived to serve the search warrant, one of the

16  statements that Mr. Fasold said is, "So the dark web and Tor is

17  not anonymous."  That's why general deterrence is important.

18  We want people to know, no, it's not anonymous, and here are

19  the consequences.  We want to send messages about the

20  commitment of law enforcement and about the pursuit of justice

21  for these cases.

22       When it comes to Mr. Fasold's physical condition, so

23  as I look through what I submitted to the Court, when the

24  Government was saying, you know, this is -- he attempted

25  suicide to deny these families today, to deny this day of

1    justice, maybe that's not the most effective way I could say

2    it.  I think the better way to say it is he did it despite

3    knowing that he was going to be denying them this day.

4         He attempted suicide with the primary purpose -- I'm

5    sorry.  He did not attempt suicide necessarily with the primary

6    purpose of denying them this day, but it was a continuation of

7    the pattern that we've seen through all the different

8    considerations the Court has made.  It was a consideration of

9    the pattern that he does what he wants without regard for the

10   harm that he will cause others.  If he had been successful and

11   these individuals hadn't had a chance to have closure and to

12   face him and address him, it would have been an additional

13   harm.  And that did not hold him back from trying and trying

14   and trying.

15        So while the Government agrees that a modest variance

16   or departure is appropriate due to Mr. Fasold's physical

17   condition, I couldn't -- I wanted -- you know, sometimes we

18   come before your court and we're asking for a particular number

19   or a range.  And I know that was lacking in my memo because I

20   can't determine a number to put on that.  There's no objective

21   place for me to tie paraplegia to to say "Here's how it's been

22   treated in the past."

23        Instead, I think the considerations, you know, that

24   Attorney Willson has well documented about the medical

25   condition are important for the Court to consider but also the

```
1    counterbalancing fact of his physical state is directly related
2    to his own hand.
3            I think some of the cases that were cited last night
4    with the 5H1.1 variance involved kidney failure.  That's very
5    different than someone who is attempting suicide.
6            Also consideration that there is a benefit of the Plea
7    Agreement.  It may not seem like a great benefit, but it was a
8    cap of 50.  There have been cases where, mostly hands on, where
9    we've charged multiple counts; and that could have put the cap
10   even higher, 70, you know, 80, whatever.
11           And finally, the BOP is able -- the Bureau of Prisons
12   is able to take care of Mr. Fasold.
13           You know, when, as Chuck alluded to, Attorney Willson
14   alluded to earlier, we've had a number of cases.  And in my
15   experience, most defendants who commit child pornography
16   offenses prefer to be in federal court -- I'm sorry -- federal
17   custody.  There's more trust that the Bureau of Prisons will
18   take care of them.  They often want to be in Federal Bureau of
19   Prisons because there's better programming and because there's
20   more safety.  So while I do not condone any of what's happened
21   so far, I do have some faith that he will be safer once
22   designated.
23           A very long sentence, Your Honor, is not retribution.
24   It's not vengeance.  It's justice.
25           Mr. Fasold not only harmed the children in those
```

1    images and the parents that tried so hard to protect those

2    children, but he harmed the name of the Plainville Blue Dolphin

3    Swim Team.  He's the bad apple in the bowl that tarnished the

4    name and ruined that experience for many of the children and

5    parents who enjoyed that organization in the past and may not

6    join going forward.

7         So just in closing, I just want to say a quick thank

8    you to the U.S. Marshal Service for all that they've done to

9    get us to today.  It's been yeoman's work on their part to make

10   sure that all the transports went through successfully.  And

11   the FAA did not help matters on Wednesday, so we're happy to be

12   here today.

13        I think the only housekeeping matter, Your Honor,

14   would be I know there was a discussion about the videotape.  If

15   that's not required, I think we should just make a note that

16   that's no longer necessary.

17        THE COURT:  Thank you.

18        MR. WILLSON:  Your Honor, we don't need the video.

19        THE COURT:  We don't need the video?

20        MR. WILLSON:  We don't need the video.

21        THE COURT:  Is there anything else you want to say?

22        MR. WILLSON:  Can I just have one second?

23     (Pause.)

24        MR. WILLSON:  Your Honor, I have one point.  Maybe

25   it's just being a stickler.  Kidney failure, paralysis due to

1   severe depression, it's this idea that he did it by his own

2   hand and thus it should not be recognized in the same way is a

3   rejection of everything we know about mental health in terms of

4   how it can impact people.

5           I feel odd saying this in front of the group here;

6   but, like, depression and what it causes people to do and the

7   choices they make is not someone who needs a hip replacement.

8   That was one of the facts in one of the cases.  So the

9   discretion that the Court has, given his physical condition,

10  frankly given his mental health condition, is significant and

11  given the parsimony clause should be a very important factor in

12  the Court's sentencing.

13          I have nothing further unless the Court has questions.

14          THE COURT:  Thank you.  Thank you both.  So as I said,

15  I'm going to take a short recess.  Now, I just want -- if I may

16  inquire of the marshals, would you be able to have him back

17  here in ten minutes?

18          A MARSHAL:  I believe so, Your Honor.

19          THE COURT:  Let's make it ten minutes, keep it kind of

20  short.  Folks, if you want to stay in your seats, you can.

21  There's no problem with the CO2.

22      (Recess from 1:01 p.m. to 1:12 p.m.)

23          THE COURT:  All right.  I'm ready to turn to the

24  imposition of sentence.  This is an unusual sentencing because

25  of its length, for one thing, and the number of people who are

1    affected by it.  But that doesn't change how I'm required to

2    approach it, and I'll talk more about that in a moment.

3           I do want to begin first by recognizing and thanking

4    the speakers today, beginning with the victims and their

5    families.  And I'd like to begin with the victims who were

6    minors and who were direct victims of this conduct who spoke

7    today and also those who didn't speak but submitted letters.

8           First of all, from my standpoint, it's always helpful

9    to hear from victims, to read how a crime has affected them,

10   because it's part of the information I'm required to consider

11   in a sentencing.  But, obviously, for the minor victims in this

12   case, particularly for those who spoke today, I must say I'm

13   filled with admiration at your strength, at your bravery.  I'm

14   quite sure I could not have done that when I was your age, and

15   I doubt most adults could have.  You are strong individuals,

16   and you will go on to do great things.

17          To the parents, I cannot imagine how painful and

18   difficult these last few years must have been for you.  I read

19   the letters, and so I have some idea.  And as I said, I had a

20   swimmer and can't imagine how devastated she would have been

21   and our family would have been had something like this

22   happened.  So, obviously, my heart goes out to you.

23          I will say there's one thing that I do agree with Mr.

24   Fasold on, which is none of this is your fault.  I think, as

25   parents, it's understandable that you tend to think of, you

1   know, what I should have done to protect my child differently.

2   None of this is your fault.  And that goes even for Mr.

3   Fasold's sister-in-law who spoke, who obviously clearly does

4   feel guilt.  Not her fault.  This isn't her fault.

5         I also want to acknowledge counsel today.  I've had

6   the pleasure of having both Attorney Gifford and Attorney

7   Willson appear before me many times, and so I know them well.

8   But I think it's worth a few words.  You know, the folks who

9   are victims and victims families, you've gotten to know

10   Attorney Gifford, and you've gotten to know what an excellent

11   lawyer she is.  And you saw that today.  I do want to say a few

12   words about Attorney Willson, who you don't know.

13         It's hard to be a criminal defense lawyer in the best

14   of circumstances, in the routine cases, in the cases that are

15   not as emotionally charged as this one.  It is extraordinarily

16   difficult to do so and do so effectively, as Mr. Willson has

17   done, in a case like this.  Whatever you may think about his

18   arguments, please understand that he has an obligation to press

19   as hard as he can for his client within the bounds of the law

20   and that I would not be able to do my job if he didn't do that,

21   if he shied away from that because he was worried about what

22   people might think of him.  He did his job today very

23   effectively and in this case very effectively, and I thank him

24   for that.

25         And that brings me to my job.  My job here is, first

1    and foremost, to follow the law and do my best to make sure

2    that its purposes are accomplished.  It's not to be swayed by

3    who spoke the most movingly, about who had more speakers or

4    anything like that.  It is to, first, take account of the

5    factors that I'm required to consider by the statute, which is

6    the law that governs what I'm doing right now, and that statute

7    is Section 3553(a) of Title 18 of the United States Code.  And

8    the factors that I have to consider are:  Mr. Fasold's

9    background and characteristics, the nature and circumstances of

10   this crime, the purposes of a criminal sentence.

11          And you heard the lawyers talk about the purposes of a

12   criminal sentence.  But I'll just list them for us now:

13          Punishment.  And punishment itself isn't some sort of

14   general concept that, you know, you think about when you're a

15   kid and you do something wrong and your parent says there's

16   going to be punishment.  It's much more specific than that.

17   Punishment means the need for the sentence that the Court

18   imposes to reflect the seriousness of the offense and the need

19   for that sentence to promote respect for the law.

20          Deterrence is another purpose of a criminal sentence.

21   You heard the lawyers talk about that.  There's specific

22   deterrence, which means deterring Mr. Fasold, making sure that

23   the sentence sends him a message that he won't want to do this

24   again.  And there's general deterrence, which means sending a

25   message to other people out there who would hide behind their

1   computers or surreptitiously record people or distribute or

2   trade child pornography.  Those people need to be sent a

3   message.  That's general deterrence.

4          Another purpose of sentencing is rehabilitation.

5   Rehabilitation means addressing medical, physical, mental, and

6   other needs that a defendant has.

7          And, finally, another purpose of a criminal sentence

8   is protecting the public from further crimes by Mr. Fasold.

9          Those are the purposes of a criminal sentence that I'm

10  required to consider.

11         Yet another factor the law considers me to consider is

12  the sentencing guidelines.  Here the guidelines range is 600

13  months of imprisonment and 5 years to life for supervised

14  release.

15         I have to consider the need to avoid unwarranted

16  sentence disparities among defendants with similar records

17  who've been found guilty of similar conduct.

18         I have to -- in this case, I certainly have to also

19  consider the need to afford restitution.  That's going to come

20  later.

21         Now, what these factors ultimately require me to do is

22  to take everything that I've learned about the case, everything

23  that I've learned about Mr. Fasold, everything that's good,

24  everything that's not good, and weigh that information to

25  determine a sentence that is fair, just, and reasonable and

1   also a sentence that is sufficient but no greater than

2   necessary to serve the purposes of sentencing that I listed a

3   moment ago.

4        I want to pause on that last part.  That's sometimes

5   called the "parsimony clause."  But fundamentally what that

6   means -- this is important to understand -- that my job is to

7   pick the lowest sentence that I can that I believe will still

8   be consistent and will fulfill the purposes of sentencing that

9   need to be fulfilled here.  That's what the law requires me to

10  do.

11       Now, I've considered all of the factors, but there are

12  certainly unique factors about this case.  And the best way,

13  therefore, for me to explain my decision is to walk through

14  each of these factors and explain how I think it applies based

15  on the facts here, beginning with Mr. Fasold's background and

16  characteristics.

17       So there's no doubt Mr. Fasold had a normal middle

18  class childhood, participated in sports.  He graduated from

19  high school.  He went to college, had some issues in college

20  with alcohol and drug abuse, but he graduated.  He began

21  steady, ultimately lucrative employment.  He got married, had

22  children.  He had a good job.  He was in good health.

23       But, of course, he also had a secret during that time.

24  And I'm going to talk more about that when I get to the nature

25  and circumstances of this crime.  And so as people have said,

1    that was a false lie.  And, again, I'll talk more about that.

2        Now, since his arrest, by his own hand, his health has

3    changed quite drastically.  Mr. Fasold has made multiple

4    suicide attempts.  They have left him paralyzed from the waist

5    down and with severe complications from his spinal injuries.

6    He unquestionably suffers from mental health issues.  Mr.

7    Willson did not go into great deal about this, but he submitted

8    evidence in the record that makes it very clear, unfortunately,

9    that Mr. Fasold's physical prognosis and life expectancy are

10   not good and that he will almost surely continue to experience

11   serious medical complications as a result of his injuries.

12       He is, I think, incredibly fortunate to have the

13   support of his mother and sister, who I also want to commend

14   today for speaking.  I thought that showed bravery.

15       Turning to the nature and circumstances of this crime,

16   now, this is not something that is gray or anything.

17   Obviously, this is an extremely serious crime.  There are --

18   the harm inflicted is enormous.  There are dozens of victims

19   whose lives have been scarred.  For some those scars will be

20   permanent.  They and their families have already suffered real

21   harm.

22       You heard about just a portion of it today:  inability

23   to use a public bathroom; inability to trust the men in their

24   lives, in one case someone's own father; fear of strangers and

25   cameras; inability or hampered ability to participate in

1    sports; depression; paranoia.  And not just to one or two or

2    three or four people and not just done a few times but over

3    three years and affecting dozens of people.  There are 27 minor

4    victims in this case.  There are another 15 or so adult

5    victims.  I have never had a case, Mr. Fasold, with this many

6    victims, fraud, child pornography, any case.

7         And coming back to your secret life, unfortunately, I

8    have had experience with cases involving sexual predators.  And

9    when I say I've never seen a case with that many victims,

10   that's not true.  I've never seen a case since I've been a

11   judge with this many victims.  I have experience,

12   unfortunately, with a case with another sexual predator, and I

13   worked with experts in that case.  And so I came,

14   unfortunately, to know some of the characteristics of a sexual

15   predator.  And, unfortunately, you fit them to a tee.

16        You were intelligent.  You were charming.  You were

17   everybody's version of a great guy in the community and a great

18   father, all the while insinuating yourself into the lives of

19   your daughter's friends, of people on the swim team you were

20   associated with, all ultimately to gratify your own perverse

21   desires.  There's no question that there's a need to protect

22   the public here from you and a need to specifically deter you.

23        I agree with Attorney Gifford about the forensic

24   examination that was conducted.  I thought it had a lot of

25   limitations, but ultimately the results were such that I should

1    have really no confidence even despite your injuries that you

2    don't represent a continued danger.

3         The harm that you inflicted went on.  I don't want to

4    shortchange it.  Some of the material you collected ended up as

5    currency on the dark web where it will remain for as long as

6    the internet exists.

7         Now, Mr. Willson is correct.  He's correct both in

8    pointing it out not just because of his role as an advocate but

9    because it matters under the law.  I do recognize there are

10   differences between this case and others, and it is my job to

11   take account of those differences.  Part of sentencing is

12   understanding what may seem like unimportant gradations in

13   conduct.

14        This case did not involve conduct -- excuse me.  This

15   case did not involve contact or coercion or enticement, which

16   many of these cases do.  And that is something the Court will

17   consider.

18        Turning to the purposes of a criminal sentence, I've

19   already addressed protecting the public.  There's clearly a

20   need for that.  Obviously, there's a need to, given how serious

21   the crime is, to reflect that seriousness.  And the sentence

22   will.

23        I will say one thing about that, and I'll just come

24   back to my job, which is to recognize that there are gradations

25   in different types of crimes and even across crimes.  And,

1    unfortunately, I see a lot of really horrible conduct.  And so,

2    yes, Mr. Willson makes a valid point when he says, "Judge, as

3    awful as it is, this isn't the worst that you've seen."  That's

4    true.  But it's a very serious crime.

5         In terms of general deterrence, this was kind of an

6    interesting discussion today about whether, in fact, a sentence

7    in this case would afford general deterrence.  You know, Mr.

8    Willson's right.  There are studies that question that in

9    certain types of cases.  I haven't really seen any of those

10   studies in this type of a case.

11        I will say that for a noncontact offense done behind

12   the screen of technology, done surreptitiously, if it weren't

13   on such a grand scale and if you didn't understand the pain it

14   causes, something that some might think of as sort of like an

15   adolescent prank, I think eliminating that misperception is an

16   important purpose of the sentence.  I think it's important to

17   send a message that the law sees it not as a prank but instead

18   for what it is, the victimizing of innocent persons who trusted

19   that they could fill the -- fulfill the basic needs of getting

20   changed or using the bathroom in privacy.  And certainly I

21   think it's important the law send that message.  I think it's

22   important to point out, though, that the law is clear that the

23   likely recipients of this message, their conduct is not likely

24   to be substantially affected by it.

25        So I'm going to turn to the issue of disparities now.

1   Well, actually, I'll turn to the guidelines first.

2            So the guidelines -- well, first of all, the

3   guidelines do recognize the possibility of a departure for Mr.

4   Fasold's physical condition, not -- and I think it's important

5   to point something out here.  It's not something -- it's not a

6   matter of feeling sorry for him.  Okay?  It's not -- because as

7   several of you point out, he did this to himself.  I'm quite

8   aware of that.

9            It's a matter of understanding what his life is going

10  to be in prison.  And I think, if anything, Mr. Willson

11  understated how limited and nasty and potentially short it

12  could be.  I think -- and I don't want to be grizzly, but I

13  can't fail to recognize that it's not clear that Mr. Fasold

14  will survive prison even if he does not attempt to commit

15  suicide again.  The effects of his spinal injuries are such

16  already that that is a real question.  I'm not making this up.

17  Mr. Willson has submitted a lengthy statement by a doctor that

18  I think fully substantiates this.

19           But the other thing I have to say about the guidelines

20  is that although there's a Second Circuit case called *Dorvee*

21  that Mr. Willson mentioned in his brief and the Government also

22  addressed, and the Government points out correctly that *Dorvee*

23  does not apply on its face to the child pornography guideline,

24  nonetheless, some of the reasoning -- and *Dorvee* is a case that

25  criticizes severely the child pornography possession guideline

1    and suggests that district judges should be extremely careful

2    in applying it.  I do think some of that reasoning does apply

3    to the production guideline and to the distribution guideline.

4    For example, the computer enhancement, the number of images

5    enhancements, and the like are both arbitrary, I think, and

6    also let's just say out of date since really all the conduct

7    that we see is -- involves computers.  So I do think that the

8    guidelines range does not provide useful advice to the Court in

9    this case, and it's not going to be the basis for the sentence.

10            Now to turn to the issue of disparities, you know, you

11    heard the lawyers talking about a case from Ohio, and there's

12    other cases cited in the briefs.  I think I share the view of

13    the other judge that Mr. Willson mentioned that while the issue

14    of disparities is something I'm required to consider, it

15    doesn't weigh heavily because no case is the same.  One can

16    always point to pretty significant differences in cases, as the

17    Government did.

18            I do think that it is worth again, and I've said this

19    a few times, I do have to distinguish between a case that

20    involves contact or force and one that doesn't.  On the other

21    hand, I also have to distinguish between a case that involves

22    one or two victims and that involves, you know, 40.  So those

23    are all things that I have to consider.  But the short of it is

24    is that ultimately the issue of disparities doesn't weigh for

25    very much in my view.

1      I will say one other word before I announce the

2  sentence about protecting the public.  And that is to say this:

3  I'm not going to sentence Mr. Fasold to 50 years, and I'm not

4  going to impose a life sentence.  I can't anyway.  But I

5  wouldn't if I could.  But it is important to understand

6  something about what -- where Mr. Fasold will be and the extent

7  to which the federal criminal justice system will be involved

8  in his life if and when he gets out of prison.  And you'll hear

9  this in a little while when I describe the conditions for

10  supervised release.

11      Those conditions, in any child pornography case,

12  including this one, are incredibly extensive, intrusive, and

13  controlling, as they should be.  In no way am I asking for any

14  sympathy for anyone subject to those conditions.  The point I'm

15  making is simply this:  Part of the purpose of sentencing is to

16  protect the public.  And I do believe that those conditions and

17  the involvement of a federal probation officer will go a long

18  way towards protecting the public, especially given how old Mr.

19  Fasold will be when he emerges from prison and the physical

20  state that he will be in at the time.  When you add all of it

21  together, I do believe that those conditions will substantially

22  assist in protecting the public.

23      All right.  So this is a difficult case.  But, again,

24  my job is to select the lowest sentence that I believe will

25  fulfill the purposes of sentencing and also to take account of

gradations between this case and other cases that I have

sentenced or been involved in.

Having done all that, I find that the following

sentence is the one that is sufficient but no greater than

necessary to serve the purposes of sentencing that need to be

served here:

Mr. Fasold, I sentence you to 20 years of imprisonment

on Count One -- that's 240 months on Count One -- and 5 years

of imprisonment -- that's 60 months -- on Count Three to run

consecutively for a total effective sentence of 25 years in

prison.  I also sentence you to 15 years of supervised release.

In addition to the standard conditions of supervised

release, the following mandatory conditions are imposed:

first, the defendant shall not commit another federal, state,

or local offense; second, he shall not unlawfully possess a

controlled substance; next, he shall refrain from any unlawful

use of a controlled substance and submit to one drug test

within 15 days of release on supervised release and at least

two periodic drug tests thereafter for use of a controlled

substance; next, he is required to make restitution in

accordance with applicable statutes and to pay the assessment

imposed in accordance with applicable statutes; in addition,

he's required to report his address and any subsequent change

of residence to the probation officer responsible for

supervision, and he's required to register as a sex offender in

1    any state where he resides, is employed, carries on a vocation,

2    or is a student; next, he shall cooperate in the collection of

3    a DNA sample.

4            In addition to those standard and mandatory

5    conditions, the following special conditions of supervised

6    release are imposed:

7            First, you must comply with the requirements of the

8    Sex Offender Registration and Notification Act as directed by

9    the Probation Office, the Bureau of Prisons, or any state sex

10   offender registration agency in which you reside, work, are a

11   student, or were convicted of a qualifying offense.

12           Second, you must participate in a mental health

13   treatment program with an emphasis on sexual offender treatment

14   as approved by the United States Probation Office and must

15   abide by policies and procedures by the program which may

16   include -- which may include polygraph testing.  You must pay

17   all or a portion of the costs associated with treatment based

18   upon your ability to pay, as recommended by Probation and

19   approved by the Court.

20           Third, you must submit to periodic polygraph testing

21   at the discretion of the Probation Office as a means to ensure

22   that you are in compliance with the requirements of your

23   supervision following the completion of a sex offender

24   treatment program.  You must pay all or a portion of the costs

25   associated with testing based on your ability to pay, as

1    determined by Probation.

2           Next, you must not view, purchase, or possess any

3    materials, including but not limited to pictures, photographs,

4    books, writings, drawings, videos, or video games, depicting

5    child pornography as defined in Title 18, United States Code,

6    Section 2256, subsection capital A, or otherwise contrary to

7    the antipornography laws of the United States.

8           Next, you must not have direct contact with any person

9    you know or reasonably should know to be under the age of 18

10   without permission of the probation officer.  If applicable,

11   the U.S. Probation Office, in consultation with appropriate

12   child welfare agencies and/or treatment providers and with the

13   approval of the Court, will determine whether you may have such

14   contact with your own children or relatives.

15          Next, you must provide the U.S. Probation Office with

16   access to any requested financial records, including but not

17   limited to telephone and cellular phone bills and credit card

18   statements.  The purpose of this condition is to ensure that

19   the defendant does not purchase software, equipment, or

20   services designed to block or circumvent the computer

21   monitoring condition, that he does not purchase child

22   pornography or access child pornography, and that he does not

23   have contact with minors.

24          Next, you shall avoid and are prohibited from being in

25   any areas or locations where children under the age of 18 are

1   likely to congregate, such as schools, day care facilities,

2   playgrounds, and theme parks, unless prior approval has been

3   obtained from the U.S. Probation Office.

4        Next, you must not associate or have any contact with

5   anyone you know or reasonably should know to be a convicted sex

6   offender or those identified as inappropriate by the U.S.

7   Probation Office because of a connection to sexual abuse of

8   minors or sexually explicit materials involving minors except

9   as part of an approved counseling program.

10       Next, you must not be employed in any position or

11  participate as a volunteer in any activity that involves

12  contact with children under the age of 18 except as approved by

13  the probation officer.

14       Next, you must submit your person, residence, office,

15  and vehicle to a search conducted by a probation officer at a

16  reasonable time and in a reasonable manner based upon

17  reasonable suspicion of contraband or evidence of a violation

18  of a condition of release.  You must warn any other residents

19  of the premises or users of such vehicles that the premises and

20  vehicles may be subject to searches under this condition.

21       Next, you must submit all computers, as defined in

22  Title 18, United States Code, Section 1030, subsection (e)(1),

23  all mobile phones, all other electronic communication or data

24  storage devices, all media cameras, drones, photographic

25  equipment, and all internet-capable devices and related

equipment owned, controlled, or used by you to a search
conducted by a probation officer at a reasonable time and in a
reasonable manner based upon reasonable suspicion of contraband
or evidence of a violation of a condition of release.  You must
warn any other users of such items that the items may be
subject to searches under this condition.

Next, you must permit the U.S. Probation Office to
install monitoring software on any and all electronic devices
owned, controlled, or used by you for the purpose of
determining whether the defendant is viewing or accessing child
pornography, as defined in federal law, and/or whether the
defendant has been in contact with minors.  You must pay all or
a portion of the costs associated with such monitoring based
upon your ability to pay as determined by the Probation Office.
You must not download, install, or utilize any application,
software, or hardware that will prevent the Probation Office
from monitoring such electronic devices.  This includes but is
not limited to encryption, anonymity, or invisible mode
software or devices or dark web internet browsers.

Next, to ensure compliance with the preceding
monitoring condition, you must allow the U.S. Probation Office
or its designee to conduct initial and periodic unannounced
reviews of any and all electronic devices subject to monitoring
for the purposes of determining whether the device contains any
prohibited data prior to the installation of the monitoring

1   software, the monitoring software is functioning effectively

2   after its installation, and whether there have been attempts to

3   circumvent the monitoring software after its installation.  You

4   must warn any other people who use these devices that the

5   devices may be subject to review under this condition.  You

6   must allow the U.S. Probation Office to use such equipment, as

7   is necessary, to determine the presence of an internet or Wi-Fi

8   connection.

9           Next, if the probation officer determines that you

10  pose a risk to another person, including an organization, the

11  probation officer may, with the Court's approval, require you

12  to notify the person or organization about the risk, and you

13  must comply with that instruction.  The probation officer may

14  contact the person or organization and confirm that you have

15  notified the person about the risk.

16          Next, you must consent to the third-party disclosure

17  to any employer or potential employer, with the Court's

18  approval, and community service site or other interested party

19  as determined by the Probation Office of any computer-related

20  restrictions that are imposed.

21          Next, you must not knowingly communicate with anyone

22  you know or reasonably should know to be a minor via telephone,

23  text messaging, e-mail, social media, mobile application, the

24  internet, or any other electronic means.

25          Next, you must have no contact, direct or indirect,

1    with any of the minor victims in this case or any of the

2    additional victims in this case or of any of their family

3    members by any means, including in person or by telephone,

4    mail, fax, text, e-mail, chat rooms, instant messaging, over

5    the internet, through Facebook or other social media, or

6    through any other form of electronic communication.  You agree

7    to permit the U.S. Probation Office to use monitoring software

8    to determine whether you have been in contact with individuals

9    in violation of this condition.

10            Next, if restitution is ordered, you must provide the

11   probation officer access to any requested financial information

12   and authorize the release of any such financial information.

13   The probation officer may share financial information with the

14   U.S. Attorney's Office and the Federal Defender's Office.

15            Next, you must pay any restitution that is imposed by

16   this judgment.  If you are unable to pay the full balance in a

17   lump sum, any remaining balance is payable at a rate of not

18   less than $200 per month or 10 percent of your gross monthly

19   income, whichever's greater.  The monthly payment schedule may

20   be adjusted based on your ability to pay, as determined by

21   Probation and approved by the Court.

22            Next, you must participate in a program recommended by

23   Probation and approved by the Court for mental health

24   treatment.  This is apart from sex offender treatment.  You

25   must follow the rules and regulations of that program.  The

1  probation officer, in consultation with the treatment provider,

2  will supervise your participation in the program.  You must pay

3  all or a portion of the costs associated with treatment based

4  on your ability to pay, as recommended by Probation and

5  approved by the Court.

6          I impose no fine.

7          We will determine restitution later.

8          You're required to pay a special assessment of $200.

9          With regard to the Justice for Victims of Trafficking

10  Act of 2015, I impose no assessment because I find that the

11  defendant is indigent.

12          With regard to the additional assessments under the

13  Amy, Vicky, and Andy Child Pornography Victim Assistance Act,

14  I'm not going to impose those assessments either because of Mr.

15  Fasold's current indigency and based on the possibility that

16  any assets or income he should get I want to go to any

17  restitution in this case.  So I'm not going to impose those

18  either.

19          All right.  I think I mentioned the special assessment

20  of a hundred dollars per count for a total special assessment

21  of $200 in this case.

22          Does either counsel know of any reason that the

23  sentence I described cannot legally be imposed as the sentence

24  of the Court?

25          MS. GIFFORD:  Not from the Government, Your Honor.

1        MR. WILLSON:  Your Honor, I know we're going to talk

2    about appellate rights in a second.  Mr. Fasold and I have not

3    talked about appeal, no appeal, whatever.  I don't want people

4    to think this is some grand plan.  Under the law he has a right

5    to appeal.  I know Your Honor's going to address that in a bit.

6        Under the policies of the Federal Defender's Office

7    for whom I work, under the Second Circuit case, I believe it's

8    *United States vs. Villafuerte*, I'm obligated to object to the

9    extent that I think that the sentence is procedurally

10   unreasonable -- and I don't want to go down all that path again

11   unless you do -- or otherwise substantially unreasonable as

12   well.

13        THE COURT:  You mean "substantively."

14        MR. WILLSON:  "Substantively," I'm sorry, yes.  Thank

15   you.

16        THE COURT:  Very well.

17        Mr. Fasold, the sentence I've described is the

18   sentence that's imposed in your case.  The judgment will be

19   prepared for my signature by the Clerk's Office in consultation

20   with the Probation Office.

21        You want Devens?

22        MR. WILLSON:  Your Honor, I don't want to complicate

23   things.  I am told he's probably not going to be able to go to

24   Devens, so that makes me hesitant to say we recommend Devens.

25   I don't know if we want to have a conversation with the

1    marshals service.

2            THE COURT:  Even now?

3            A MARSHAL:  Can I meet with you at sidebar?  I'm going

4    to show you an e-mail from our marshal.

5        (Pause.)

6            THE COURT:  So the deputy marshal was kind enough to

7    show me some information from the United States marshal.  It

8    doesn't sound like very hard and fast information at this

9    point.  It's just apparently there was some communication with

10   the BOP.  But I can still make my recommendation.

11           And I certainly -- I mean I'm going to mention that

12   he's a suicide risk in the recommendation.  That I'm going to

13   do whether you want me to or not.  I think he clearly belongs

14   in an FMC based on the declaration you submitted, and I think

15   Devens is the appropriate FMC.

16           I mean, again, so everybody knows, I don't decide

17   where Mr. Fasold will be housed.  That's up to the Bureau of

18   Prisons, which is not part of the Judicial Branch; but I can

19   make a recommendation.  And I would be -- I wish I could demand

20   an explanation if they don't let him in at FMC Devens, which is

21   in my view plainly where he belongs.

22           MR. WILLSON:  And I recognize the Court -- this is an

23   issue we've discussed in conferences in the past.  I think even

24   the Government's not too opposed to the Court's viewpoint or my

25   viewpoint on it.  I'm going to defer to Your Honor a little

 1    bit.  I don't know if it makes sense to do a really strongly

 2    worded --

 3         THE COURT:  I'm going to.  I'm not going to put up

 4    with this.  We've had to deal with this in this case in the

 5    past.  It would have made things for everybody concerned a lot

 6    easier.  I don't mean to scapegoat the BOP, but you got to be

 7    kidding me.  Anyway, I'm going to recommend Devens rather

 8    strongly.

 9         MR. WILLSON:  Okay.  I stand behind that, Your Honor.

10         THE COURT:  Fine.

11         So as Mr. -- Mr. Fasold, as Mr. Willson noted, you

12    have a right to appeal the sentence.  The sentence exceeds the

13    term set forth in the appeal waiver in your Plea Agreement, so

14    you have a full right to appeal the sentence.  If you wish to

15    appeal, you have to file a written notice of appeal within 14

16    days of the entry of judgment.

17         Do you understand that time limit?

18         THE DEFENDANT:  Fourteen days, yes, Your Honor.

19         THE COURT:  All right.  Very well.  I should say -- I

20    want to be precise.  I imagine the Plea Agreement says -- I

21    don't have it in front of me, but I imagine it says you have a

22    right to appeal the sentence to the extent that it exceeds the

23    amount in the waiver; is that right?

24         MS. GIFFORD:  I believe that's right.  I have the Plea

25    Agreement.

1           THE COURT:  Hold on one second.  I can pull it up.

2           Yeah, the parties agree any challenge to the

3    defendant's sentence that's not foreclosed by this provision

4    will be limited to that portion of the sentencing calculation

5    that is inconsistent with or not addressed by this waiver.

6           So at least as I read the Plea Agreement, Mr. Fasold,

7    you'd be limited to challenging the portion of the sentence

8    that exceeds the waiver.  But it doesn't matter.  You can

9    challenge the sentence.  So, again, 14 days.

10          If you wish to appeal and you can't afford to pay the

11   filing fee, the Court -- you can file a motion to appeal in

12   forma pauperis.  If the Court grants that motion, it will waive

13   the fee for your appeal and appoint a lawyer to represent you

14   at no cost to you.

15          Do you understand?

16          THE DEFENDANT:  Yes.

17          THE COURT:  I believe there was an extra count of the

18   Indictment.

19          MS. GIFFORD:  Yes, Your Honor.  The Government moves

20   to dismiss Count Two at this time.

21          THE COURT:  All right.  That's granted.  Is there

22   anything else to discuss?

23          MS. GIFFORD:  Nothing from the Government, Your Honor.

24          MR. WILLSON:  Nothing from me, Your Honor.  Thank you.

25          THE COURT:  We'll be in recess.

1        (Proceedings concluded at 1:55 p.m.)

2

3

4                    C E R T I F I C A T E

5

6        UNITED STATES OF AMERICA VS. KYLE FASOLD

7                    NO. 3:20-CR-193 (MPS)

8

9

10               I, Julie L. Monette, RDR, CRR, CRC, Official

11   Court Reporter for the United States District Court for the

12   District of Connecticut, do hereby certify that the foregoing

13   pages are a true and accurate transcription of my shorthand

14   notes taken in the aforementioned matter to the best of my

15   skill and ability.

16

17

18              /S/ JULIE L. MONETTE
     _____
19            Julie L. Monette, RDR, CRR, CRC
                  Official Court Reporter
20            450 Main Street - Clerk's Office
                Hartford, Connecticut 06103
21                  (860) 212-6937

22

23

24

25